No. 119,790

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JEREMIAH WILTON BROWN,
*Appellant*.

SYLLABUS BY THE COURT

1.

Prosecutors commit error when they misstate the law or inflame the passions and prejudices of the jury. Here, the prosecutor's comments throughout closing arguments repeatedly referring to Brown's voluntary intoxication defense as a "big fat excuse," telling the jury to skip certain jury instructions, and alleging that the trial judge had the hardest job because it had to sentence Brown for each crime constituted misstatements of law intended to inflame the passions and prejudices of the jury.

2.

The Fifth Amendment to the United States Constitution safeguards addressed in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966), come into play whenever a law enforcement officer expressly questions a person in custody. The *Miranda* safeguards also come into play whenever a law enforcement officer subjects a person in custody to the functional equivalent of interrogation.

3.

A law enforcement officer's intonation while speaking to a person in custody may signal that a remark syntactically identical to a declarative statement is the same as an

1

indirect question. This indirect question may be the functional equivalent to prohibited custodial interrogation. Under the facts of this case, the law enforcement officer's intonation while arresting Brown establishes that the officer engaged in the functional equivalent of custodial interrogation.

4.

When a defendant moves for a jury trial continuance because that defendant's witness cannot testify at the jury trial as scheduled, in deciding whether to grant the defendant's continuance motion, trial courts must weigh the factors listed in *State v. Howard*, 221 Kan. 51, 55, 557 P.2d 1280 (1976): (1) the probability that the unavailable witness may appear at a later date should the court grant the continuance; (2) the diligence disclosed in attempting to secure the now unavailable witness; (3) the possible prejudice to the defendant; and (4) the materiality and importance of the probable testimony.

5.

When considering whether to grant a defendant's jury trial continuance motion because that defendant's proposed expert witness cannot testify at the jury trial as scheduled, the trial court must weigh the *Howard* factors without considering whether the proposed expert witness testimony would be admissible under the factors addressed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The *Howard*-factor test and the *Daubert*-factor test are distinct tests that cannot be merged without considerable prejudice to the defendant.

Appeal from Sedgwick District Court; STEPHEN J. TERNES and BRUCE C. BROWN, judges. Opinion filed March 12, 2021. Reversed and remanded with directions.

*Richard Ney*, of Ney, Adams & Miller, of Wichita, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., MALONE, J., and MCANANY, S.J.

GREEN, J.: A jury convicted Jeremiah Wilton Brown of the aggravated burglary and the aggravated sexual battery of M.K. Brown now appeals those convictions, arguing that four separate trial errors require reversal of his convictions. Alternatively, Brown argues that we should reverse his convictions and remand for a new trial because his trial attorneys provided ineffective assistance of counsel in nine separate ways.

As considered below, with the exception of Brown's argument that the trial court wrongly granted the State's K.S.A. 2017 Supp. 60-455(d) motion, Brown's arguments concerning the errors at his jury trial are persuasive: First, we conclude that the prosecutor committed several instances of error during closing arguments by (1) misstating the law, (2) inflaming the passions and prejudices of the jury, and (3) diluting the role of the jury. We determine that all these arguments were fatally prejudicial. Second, we conclude that the trial court wrongly admitted into evidence Brown's incriminating pre-*Miranda* statements resulting from his custodial interrogation. Third, we conclude that the trial court wrongly denied Brown's motion for continuance, which prevented Brown's opportunity to present expert witness testimony in support of his voluntary intoxication defense. Each of these preceding trial errors substantially prejudiced Brown's presentation of his voluntary intoxication defense.

Thus, we reverse Brown's convictions and remand to the trial court for a new trial, excluding from the trial's admission of all incriminating pre-*Miranda* statements made by Brown in connection with his arrest. Because we have reversed Brown's convictions and granted a new trial based on the previously mentioned trial errors, it is unnecessary for us to address Brown's claims of ineffective assistance of counsel.

*Background Information*

Jeremiah Wilton Brown, Jeremy Convery, Jason Conner, and M.K. all lived on the same street in Haysville, Kansas. Brown and Convery had houses next to each other on one side of the street. Meanwhile, Conner and M.K. had houses next to each other on the other side of the street across from Brown's and Convery's houses.

In addition to being neighbors, Brown, Convery, and Conner were friends who spent time with each other socially. Although M.K. was not friends with Brown, she was friendly to Brown when she saw him around the neighborhood. Previously, Brown had helped fix her lawn mower. M.K. also gave cookies to her neighbors, including Brown, at Christmas time.

*Brown's Alcohol Consumption*

On Saturday, November 26, 2016, around 8 a.m., Convery drove Brown to a local lake. Once at the lake, Brown and Convery met up with another friend, Luke Rogge, and started fishing. That morning, as the friends fished at the lake, Brown consumed a substantial amount of alcohol. According to Convery and Rogge, Brown had brought an unopened 750 milliliter bottle of Tennessee Fire whiskey with him to the lake. Convery had two sips of the whiskey. Rogge had "a little" whiskey in a cup. But Brown consumed the remainder of the whiskey while at the lake. Brown also consumed at least three Bud Lights and smoked marijuana while at the lake.

Brown and Convery left the lake and returned to Convery's house around lunchtime. Once at Convery's house, Brown and Convery socialized for another couple hours.

It is not entirely clear what Brown did immediately after leaving Convery's house around 2 p.m. Even so, around 3 p.m., Convery went over to Brown's garage—a place where Brown routinely spent time—and spoke with Brown briefly. During Brown and Convery's short conversation, Convery saw Brown drinking whiskey from an already half-empty bottle of Crown Royal. At that time, Convery also noticed that Brown was "laughing hysterically at things that were not funny." Later, Brown would allege that after leaving Convery's house, he went to a liquor store, bought "a fifth" of Crown Royal whiskey, which is a 750-millimeter bottle, and then continued to drink and smoke marijuana the rest of the day.

Then, between 10 p.m. and 11 p.m., Conner saw Brown enter a local bar where he, his wife, and some other friends were celebrating a birthday. When Conner saw Brown enter the bar, he could tell that Brown was already heavily intoxicated. According to Conner, Brown was stumbling around, being obnoxious, and slurring his words. Conner estimated that Brown consumed anywhere from 6 to 12 cocktails during the 60 to 90 minutes he was at the bar. Also, Conner had to convince Brown to leave the bar after Brown was rude to the bar's staff.

Because Brown was too intoxicated to drive home, Conner took Brown's car keys. Conner then drove Brown home in his own car. While sitting in the passenger seat, Brown repeatedly tried to drive the car by grabbing hold of the steering wheel. When they arrived at Brown's house, Conner parked Brown's car in Brown's driveway, walked Brown into his garage, and told Brown to go to bed. As Conner was leaving, Brown asked Conner to return his car keys. Although Conner told Brown that he had already returned his car keys, Conner actually kept Brown's car keys in an attempt to prevent Brown from driving later on.

After Conner left Brown in his garage, Conner returned to his home across the street. There, Conner, his wife, and their friends continued the birthday celebration. Yet,

several minutes after Conner returned home, Conner heard Brown's car "start up and the stereo start playing" before leaving Brown's driveway. Conner estimated that he heard Brown's car start up and then leave between 12 a.m. and 1 a.m. on Sunday, November 27, 2016. Although Conner never saw Brown, he assumed that it was Brown who started up Brown's car and then drove off.

Conner estimated that Brown returned home some 30 to 45 minutes later because around that time, Brown walked through his backdoor. According to Conner, Brown seemed slightly more intoxicated than when he had last seen him. Conner noted that Brown was not saying things that made sense. He noted that Brown had urinated on himself. What is more, when Conner looked into Brown's eyes, he could tell that "nobody was home." Based on Brown's appearance and behaviors, Conner believed that Brown was just "on auto pilot."

Conner allowed Brown to stay at his house until Brown retrieved Conner's bottle of Crown Royal from his freezer. At that point, Conner took the bottle of Crown Royal from Brown and told him that "he'd had enough." He explained to Brown that he was so intoxicated that he was just "wasting [his] alcohol" by continuing to drink. Conner then escorted Brown out of his house, told Brown to go to bed, and pointed Brown in the direction of his house. Conner estimated that it was between 1:30 a.m. and 2 a.m. when he escorted Brown out of his house and pointed him in the direction of his own house. And when Conner left Brown, Brown was walking towards his own house across the street.

*Brown's Altercation with M.K.*

Around 7 p.m., on Saturday, November 26, 2016, M.K. returned home from celebrating Thanksgiving with relatives in Oklahoma. After getting home, she went over to the house of her then-fiancé, Shane Adams, for a few hours. M.K. then returned to her

6

own home around 11 p.m. Eventually, M.K. fell asleep in her bedroom with the lights on while "Facebooking." Because M.K. had not intended to fall asleep, M.K. was still wearing her regular clothes at that time.

M.K. remained asleep until about 3 a.m., on Sunday, November 27, 2016. At that point, M.K. woke up to a man lying on top of her, shaking her face, saying her name over and over again. The man had "horrible breath" and smelled of "really strong smoke." The smell was so terrible M.K. "felt like [she] was going to throw up." At first, M.K. was confused about what was happening. But after "a minute," she realized that the man on top of her was Brown.

For about the next 30 minutes, Brown laid on top of M.K. while repeatedly telling her that "he wanted to have sex with [her]" and "lick [her] pussy." He told M.K. that he wanted her to move into his house. He also told M.K. that she was mean for not having sex with him, noting that she had given him cookies at Christmastime.

Also, as Brown said these things, Brown made repeated attempts to remove both his and M.K.'s clothing. Ultimately, Brown was unable to remove his pants. And M.K. prevented Brown from removing her shirt and pants. Still, during the struggle, Brown grabbed M.K.'s breast and pubic area through her clothing. Brown pushed down on M.K.'s neck each time she attempted to get away from him. Additionally, at one point, Brown "dry humped" M.K., and M.K. could feel that Brown had an erection as he "dry humped" her.

Meanwhile, throughout the ordeal, M.K. tried to persuade Brown to get off her and leave her house. Because Brown was acting abnormally, she asked him if he was drunk. Brown responded that he was drunk and had been smoking "weed."

7

She then told Brown that he should go home to his wife, who lived with him across the street. But Brown responded that his wife would not have sex with him anymore. M.K. then tried to convince Brown to repair his relationship with his wife. At some point, however, M.K. "thought of [their] neighbor [Jason Conner]" because Conner was "really good friends with [Brown]." She then told Brown that she was "[going to] go get [Conner]" if he would not leave.

Brown responded by telling M.K. not to retrieve Conner. Afterwards, M.K. convinced Brown to get off her, and the two headed towards M.K.'s front door. Yet, on the way to M.K.'s front door, Brown fell while attempting to go down some stairs. When M.K. tried to help Brown up, Brown pulled M.K. down on top of him, grabbed onto M.K., and told M.K. that he still wanted to have sex with her. But M.K. responded to Brown's renewed sexual advances by telling Brown that she would go get Conner and tell him what had happened. It was at this point Brown got up and left her house.

After Brown left M.K.'s house, M.K. went around her house making sure all her doors and windows were locked; M.K. realized that Brown had probably gotten inside her house through her front door, which she often left unlocked. Then, after M.K. secured her house, M.K. immediately grabbed her cell phone and texted Adams, asking if he was awake; M.K. sent this text at 3:37 a.m.

M.K. wanted to talk to Adams because she was both scared and unsure whether she should contact the police. M.K. later explained that at this point, she was confused what to do because Brown was normally "a good guy." M.K. also felt sorry for Brown's wife. And she worried about the police coming inside her house while it was messy. Adams, however, did not respond to M.K.'s text until 5:45 a.m. As a result, M.K. also texted her ex-boyfriend and now-husband, T.K., if he was available to talk.

8

While talking to T.K. on her cell phone around 4 a.m. or 4:30 a.m., M.K. heard a knock on the sliding glass doors at the back of her house. When M.K. investigated the knock, she found Brown standing outside of her sliding glass doors in her fenced backyard. Brown asked M.K. to let him inside her house as he was cold. M.K. refused to let Brown inside her house, telling him to go home. At this point, M.K. believed that Brown left her yard.

After finding Brown at her back sliding glass doors, M.K. was still unsure whether she should call the police. Then, around 5:45 a.m., Adams texted M.K. that he was available to talk. About 15 minutes later, as M.K. was on the phone with Adams, Brown reappeared at M.K.'s back sliding glass doors. Once again, Brown asked M.K. to let him inside her house because he was cold. And once again, M.K. refused to let Brown inside her house. M.K. then tried to convince Brown to leave her backyard by noting that a different neighbor would likely be coming outside soon.

It is unclear whether Brown left M.K.'s property after M.K. mentioned this. Regardless, shortly after M.K. last saw Brown at her back sliding glass doors, M.K. saw Brown come up to one of her side windows, which she had inadvertently left cracked. Through the cracked window, Brown repeatedly asked M.K. to "please let [him] in." It was at this point that Adams convinced M.K. to call the police.

M.K. called 911 to report Brown a few minutes before 6 a.m. The police arrived at M.K.'s house several minutes afterwards.

*The Police Investigation*

Upon their arrival at M.K.'s house, the police searched M.K.'s property to determine whether Brown was still outside. The police did not find Brown during this search.

After ensuring that Brown was no longer on M.K.'s property, the police asked M.K. exactly what had happened. At this point, M.K. provided a detailed explanation about waking up to Brown lying on top of her, telling her that he wanted to have sex, and attempting to remove her clothing. Once M.K. told the police what had happened, the police explained that a detective would likely want to conduct a formal interview with her later that day.

Ultimately, Detective Brady Simmons conducted a formal interview with M.K. just a couple hours later, around 8 a.m. During her formal interview, M.K. again explained her altercation with Brown. In the interview, she also told Detective Simmons that she did not "think that [Brown] really wanted to do what he was doing" because Brown "could have been a lot more forceful." She explained that this behavior was out of character for Brown, which therefore made her believe that Brown's behavior was the result of "whatever he took or had." She explained that after she got Brown out of her house, she was hoping Brown would go home, "get off" of "whatever he [was] on," and "hopefully [not] remember whatever he did."

At the end of her interview, M.K. told Detective Simmons that she was still unsure whether she wanted "to press charges" against Brown. Detective Simmons told M.K. that in the event she wanted to press charges against Brown, the police would not try to contact Brown until later that day after he had time to "sober up."

Sometime later that day, M.K. told Detective Simmons that she had decided to press charges against Brown. Afterwards, around 3:30 p.m., Sergeant Amos Becker and Officer Aaron Watkins went to Brown's house, knocked on Brown's front door, and spoke with Brown's wife. After asking Brown's wife if they could speak with Brown, Brown's wife retrieved Brown from inside the house. Once Brown came to his front door, Officer Watkins asked, "Hey Jeremiah, can you step out here and talk to me for a

10

minute?" Brown complied with Officer Watkins' request, exited his front door, and walked down his front porch steps. While standing on the last step of his front porch, Officer Watkins told Brown, "Okay. I need you to come over here with me."

At this point, Brown complied, saying, "Yes, Sir." Officer Watkins then directed Brown over to the sidewalk in front of his house. Once there, Sergeant Becker walked up to Brown and told him that they were "taking him in custody for an incident that [had] happened last night" and to place his hands behind his back. Brown immediately placed his hands behind his back, at which point Officer Watkins started handcuffing Brown. Although Officer Watkins and Sergeant Becker were arresting Brown, they did not give Brown any warnings as required under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966), upon his arrest.

Instead, as Officer Watkins handcuffed Brown, Sergeant Becker asked Brown "I'm assuming you know what this is about." Brown responded, "Yes, sir." Sergeant Becker then told Brown that he did not want to discuss the matter further in front of Brown's wife. He also told Brown that he would be able to talk to a detective soon. Immediately afterwards, Sergeant Becker asked Brown if he had any weapons or other items on his person that could hurt him. As Officer Watkins finished placing the handcuffs on Brown, Brown told Sergeant Becker that he had nothing dangerous on his person. Sergeant Becker then told Brown that they were going to pat him down.

As Officer Watkins patted Brown down, Sergeant Becker and Brown then had the following conversation:

> Sergeant Becker:  "I'm assuming you were kind of expecting us.
> Brown:  "Uh, no.
> Sergeant Becker:  "No.
> Brown:  "She didn't say anything.

11

Sergeant Becker:  "Okay.

Brown:  "She didn't say she was going to call the cops on me.

Sergeant Becker:  "Okay.

Brown:  "I told her I was sorry.

Sergeant Becker:  "Okay. I'll tell you what, we will go ahead and get in that discussion with our detective. We're not going to be talking to me about it. We'll just . . .

Brown:  "I didn't really do anything, you know. I didn't take my clothes off or anything.

Sergeant Becker:  "Okay."

After having this discussion, Brown was placed in a patrol carl and driven to the police station. Once Brown was read his *Miranda* rights, Brown invoked his right to remain silent.

*Brown's Criminal Case:  Pretrial Events*

Following his arrest, the State charged Brown with aggravated burglary, a severity level 4 person felony in violation of K.S.A. 2016 Supp. 21-5807(b)(1), and aggravated sexual battery, a severity level 5 person felony in violation of K.S.A. 2016 Supp. 21-5505(b)(1). Significantly, Brown's aggravated burglary charge hinged on him entering M.K.'s house to commit the aggravated sexual battery therein.

A few days after the State filed its charges, Brown bonded out of jail. He then hired Jess Hoeme to represent him. Later, Brown waived his preliminary hearing. Then, between February and July 2017, Hoeme obtained three jury trial continuances on behalf of Brown. During this same period, Hoeme filed no other motions on behalf of Brown.

Next, on July 30, 2017, while attending a music festival at El Dorado Lake in Butler County, Kansas, Brown grabbed a woman's breast without her permission. It is undisputed that Brown was very intoxicated when he grabbed this woman's breast.

12

Ultimately, Brown was charged with and pleaded guilty to simple battery, a class B person misdemeanor in violation of K.S.A. 2017 Supp. 21-5413(a)(2), in Butler County criminal case No. 17 CR 323.

When the State learned about Brown's Butler County simple battery, it moved to admit evidence of this crime at Brown's future jury trial. In its K.S.A. 2017 Supp. 60-455(d) motion, the State argued that the trial court should allow it to admit this evidence because it was "extremely probative" of Brown's "propensity to commit similar crimes." Also, around the same time, the State asked the trial court to hold a *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), hearing on the incriminating pre-*Miranda* statements Brown made to Sergeant Becker.

After the State filed the preceding motions, on September 8, 2017, Hoeme requested and was granted another jury trial continuance on behalf of Brown. After granting Brown's latest motion for continuance, the trial court reset Brown's jury trial date to October 30, 2017.

On October 20, 2017, the trial court held a joint hearing on the State's K.S.A. 2017 Supp. 60-455(d) motion and *Jackson v. Denno* hearing motion. The trial court first considered the State's K.S.A. 2017 Supp. 60-455(d) motion. To support its motion, the State admitted Brown's journal entry of judgment from that case, which showed that he had pleaded guilty as charged to simple battery in Butler County criminal case No. 17 CR 323. The State also had the victim of Brown's Butler County simple battery, S.W., testify about Brown grabbing her breast without permission. During her testimony, S.W. indicated that she believed Brown grabbed her breast without permission to satisfy his own sexual desires.

After S.W. testified, the State argued that the evidence of Brown's Butler County simple battery should be admissible at trial because Brown's criminal conduct when

13

grabbing S.W.'s breast without permission constituted evidence of sexual misconduct, which was admissible for propensity purposes. Brown responded that the trial court should not admit evidence of his Butler County simple battery at trial because in that case, he pleaded guilty as charged to simple battery. That is, Brown asserted that because the State never charged him with a sexual battery, his Butler County simple battery conviction was inadmissible for purposes of establishing his propensity to engage in sexual misconduct. But the State countered that the facts of Brown's Butler County simple battery established that his conduct constituted a sexual battery regardless of how he was charged.

The trial court ultimately agreed with the State's argument, ruling that the State could admit evidence of Brown's Butler County simple battery at trial. It ruled that under K.S.A. 2017 Supp. 60-455(d), the evidence of a defendant's prior sexual misconduct need not be criminally charged as sexual misconduct to be admissible at trial. It then determined that Brown's Butler County simple battery constituted sexual misconduct as it satisfied the elements of sexual battery under K.S.A. 2017 Supp. 21-5505(a).

After granting the State's K.S.A. 2017 Supp. 60-455(d) motion, the trial court considered the State's *Jackson v. Denno* motion. To support its motion, the State had Sergeant Becker testify about Brown's incriminating pre-*Miranda* statements. During his testimony, Sergeant Becker described Brown's incriminating pre-*Miranda* statements as "spontaneous utterances not prompted by [his] questioning after [he had] told [Brown] not to discuss this with [him]." He alleged that any question he or Officer Watkins asked Brown was "germane to the purpose of [his] arrest" or in "response to [Becker's] questions." Sergeant Becker further explained that "[his] intention for [asking Brown questions] was more to gauge whether or not [Brown] was a potential flight risk." He said that Brown was acting so calm during his arrest, he feared Brown may "attempt to escape" or "attack."

14

Significantly, during Sergeant Becker's testimony, the State admitted neither Sergeant Becker's nor Officer Watkins' bodycam video of Brown's arrest. Instead, the State relied solely on a transcript created by the Haysville Police Department to establish Brown's incriminating pre-*Miranda* statements. Also, when the State sought to admit this transcript into evidence, Brown objected, arguing (1) that the State had not provided sufficient foundation to admit the transcript, and (2) that the transcript was not the best evidence available.

The trial court then denied the State's request to admit the transcript into evidence because "the transcript itself essentially duplicates Sergeant Becker's testimony." After making this ruling, however, the State continued to argue that it should be allowed to admit "the transcript" of Brown's incriminating pre-*Miranda* statements to Sergeant Becker at trial because "Sergeant Becker . . . asked questions, very general questions that are considered general, honest questioning by police officers." It added that Brown's incriminating pre-*Miranda* statements were also admissible because they were "spontaneous utterances" made after Sergeant Becker had given him "two warnings" not to say anything.

Brown countered that the trial court should, at the very least, reserve its ruling on the admission of his incriminating pre-*Miranda* statements to Sergeant Becker because the State presented "insufficient information [for the trial court] to make a good decision as to whether or not [Brown made his pre-*Miranda* statements] freely, knowingly, intelligently, and voluntarily." In making this argument, Brown emphasized that the State was relying on the transcript that the trial court had just ruled inadmissible.

In response to Brown's argument, the State began discussing whether Sergeant Becker's questioning constituted custodial interrogation. It conceded that Brown was in custody when he made the disputed pre-*Miranda* statements to Sergeant Becker. But the State argued that because Brown "was not being interrogated" by Sergeant Becker,

15

Brown's incriminating pre-*Miranda* statements were admissible. The State continued its argument by commenting: "The law allows general on scene questioning. That's watershed case law. The witness identified his questions in relation to officer safety, again, a topic that's established within the law."

Brown responded that Sergeant Becker was interrogating him because his questions were designed to elicit an incriminating response. Nevertheless, the trial court rejected Brown's argument, holding that the State could admit evidence of Brown's pre-*Miranda* statements to Sergeant Becker at trial for the following reasons:

> "The Defendant is stating to the officer . . . that she just said she would call the police. The Defendant apologized for his behavior and that the victim's clothes were never removed by the Defendant.
>
> "He made these comments to the arresting officer. The arresting officer noted during the arrest of the defendant that he was unusually calm. Sergeant Becker was very clear in his testimony on cross-examination. He has been an officer for 11 years and that this gentleman was calm. He believed that potentially that calm could indicate that he was about to flee or attempt to flee or that he could potentially be ready to fight. I think the officer used the word—or the Sergeant used the word combat.
>
> "The bottom line is he asked the question or two to attempt to assess the Defendant with those things in mind. I would note that the officer testified he did not ask Mr. Brown about the offense or anything about the offense with which he's charged here. In fact, he affirmatively told him at least twice that he wasn't supposed to talk to the Sergeant that witnessed that. In fact, he was there to simply arrest him and take him and he would talk to the detective at the station.
>
> "The Defendant continued to make statements, the statements that I just specified, and it's my understanding of the law that the officer doesn't have the authority to prevent him from speaking. He can admonish him. I'm not quite sure what else Sergeant Becker is supposed to do.
>
> "It appears to me that after being told twice not to say anything more that he talked to the detective. That certainly is not a *Miranda* warning. I wouldn't pretend that it

16

is, *but it's a situation in which no interrogation is going on here other than a couple of questions about do you know why we're here*.

"I do not find that to be a custodial interrogation. He's clearly authorized to make—to ask a few questions as a preliminary matter, and that question does not qualify in terms of a custodial interrogation for the purpose of this offense.

"So I will find that the statements that the Defendant made to the officers were freely, voluntarily and knowingly given, and they will be admissible. The motion's granted." (Emphasis added.)

Four days after the preceding hearing on October 24, 2017, Brown admitted himself into "inpatient treatment" at a private facility for alcohol and drug treatment. The next day, Hoeme moved for another jury trial continuance on Brown's behalf. Later that same day, the trial court granted Brown's motion for continuance. The trial court then set Brown's new jury trial date for December 11, 2017.

Yet, on December 8, 2017, Hoeme requested that Brown undergo a competency evaluation. The trial court agreed that Brown needed to undergo a competency evaluation. Thus, it suspended all future proceedings in Brown's case until he had completed his competency evaluation.

Within days of the preceding hearing, however, Brown fired Hoeme as he was dissatisfied with Hoeme's representation. Brown then hired Roger Falk to represent him against the State's charges. Falk first entered his appearance on Brown's behalf on December 20, 2017.

Afterwards, on January 26, 2018, the trial court determined that Brown was competent to stand trial and returned Brown's case to the trial calendar. The trial court then set Brown's new jury trial date for Monday, April 9, 2018, noting that this new jury trial date was "very firm."

17

A few days later, Falk had Dr. Mark Goodman, a licensed psychologist and pharmacologist, conduct a two-day psychological evaluation of Brown. Falk believed that Brown's best trial strategy was to argue voluntary intoxication *and* involuntary intoxication. Thus, Falk asked Dr. Goodman to determine what effect Brown's alcohol and marijuana consumption had on his mind when he entered M.K.'s house the early morning hours of November 27, 2016. Falk further asked Dr. Goodman to determine whether Brown "was . . . able to form intent to touch [M.K.] inappropriately for the purpose of sexual arousal."

During Dr. Goodman's evaluation of Brown, Brown told Dr. Goodman about his alcohol consumption throughout his lifetime. To the extent that he could remember, he also told Dr. Goodman about his alcohol consumption throughout November 26, 2016, and the early morning hours of November 27, 2016. In addition, he told Dr. Goodman that after he went to the bar where Conner, Conner's wife, and her friends were celebrating a birthday, his "memory became clouded." He explained that after he urinated on himself and Conner "got fed up with [him]," he "[could not] remember any more details until [he] was in bed with a neighbor woman who noticed that [he] was in bed with her." And he explained that "[he was] totally oblivious of how [he] ended up in bed with [M.K.]" and could only remember "bits and pieces" of things that she had said to him during this time.

Ultimately, based on the information Brown told Dr. Goodman, Dr. Goodman told Falk that he opined that Brown was in the "stupor stage of alcohol influence" when he entered M.K.'s house the early morning hours of November 27, 2016:

> "Alcohol can cause seizures and can cause definite brain damage with excessive use. It also causes lack of inhibition. Cannabis (also known as marijuana) can definitely cause alteration of mood and memory, impaired memory, impaired motor coordination, and impaired cognitive ability. It affects self-perception, complex sensory perceptions, concentration, and information processing. It affects the ability to drive or fly. It enhances

18

the non-dominate senses of touch, taste, and smell. It can cause delusions or hallucinations and paranoid feelings. It can also increase heart rate.

"Stages of acute alcohol influence/intoxication occur with the use of alcohol. In speaking with Mr. Brown he stated that he was never tested as to his actual blood alcohol level. *It is this examiner's opinion that Mr. Brown was most likely at a level that would cause a stupor stage of alcohol influence.* For example, he mentioned urinating in his pants, having stupor, having impaired consciousness, and having a lot of muscular incoordination[,] including the lack of ability to stand or walk appropriately." (Emphasis added.)

Sometime shortly after Dr. Goodman completed Brown's evaluation, in early to mid-February 2018, Falk told Dr. Goodman that Falk's jury trial was very likely to start on Monday, April 9, 2018. Falk further explained to Dr. Goodman that he would likely call him to testify on Brown's behalf sometime after Wednesday, April 11, 2018. At the end of their discussion, Falk believed that Dr. Goodman knew that he would likely call him to testify sometime during the week of April 9, 2018. But Falk did not subpoena Dr. Goodman to ensure his availability. Also, despite having Dr. Goodman's report in mid-February 2018, it seems that Falk did not provide the State a copy of Dr. Goodman's report until the week before Brown's scheduled jury trial.

Upon receiving Dr. Goodman's report, the State moved the trial court to hold a hearing on Dr. Goodman's qualifications to testify as an expert witness as stated under K.S.A. 2017 Supp. 60-457(b) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In its motion, the State argued that the trial court should bar Dr. Goodman from testifying as an expert witness for two reasons: First, the State asserted that "lay understanding of drunkenness is well within a juror's common understanding and no expert testimony would serve to assist the trier of fact and will only confuse the jury or give prejudicial weight to the expert's lay opinion." Second, the State asserted that because Dr. Goodman was relying on Brown's and his friends' memories to establish the extent of Brown's intoxication when he entered M.K.'s

19

house in the early morning hours of November 27, 2016, Dr. Goodman's opinions were unreliable.

The next day, Thursday, April 5, 2018, the trial court scheduled a hearing on the State's *Daubert* motion to occur Monday morning, April 9, 2018, before the start of Brown's jury trial. Evidently, all parties were present when the trial court scheduled this hearing. And at that time, Falk told the trial court he was not sure Dr. Goodman could testify at a *Daubert* hearing Monday morning since he had previously told Dr. Goodman that he would not call him to testify before Wednesday, April 11, 2018.

Thus, after the trial court scheduled the *Daubert* hearing for Monday morning, April 9, 2018, Falk tried to contact Dr. Goodman to determine his availability. Falk did not reach Dr. Goodman, however, until Saturday, April 7, 2018. At that time, Dr. Goodman told Falk that he had no time to testify at the scheduled *Daubert* hearing or jury trial. Dr. Goodman explained to Falk that he had already scheduled other appointments that week because Falk had never "let him . . . know [the] date and time when he would have to [testify]."

As a result, immediately after talking to Dr. Goodman, Falk, acting on Brown's behalf, moved to continue the hearing on the State's *Daubert* motion and Brown's jury trial to ensure his availability to testify at both hearings. In this motion, Falk detailed his prior discussions with Dr. Goodman as well as Dr. Goodman's likely testimony at trial. He then argued that there was good cause to grant Brown's motion for continuance for the following reasons: (1) because Dr. Goodman's testimony was "critical" to Brown's voluntary and involuntary intoxication defenses; (2) because Dr. Goodman was uniquely qualified to provide an evaluation on Brown's alcohol and drug consumption as he had both a doctorate in psychology and "a post doctoral degree in the area of pharmacology"; (3) because Dr. Goodman's unavailability was "due to events beyond [Falk's] control"; and (4) because this was the first continuance he had requested on Brown's behalf.

20

Thus, before Brown's jury trial was set to begin on Monday, April 9, 2018, the trial court held a hearing on Brown's *Daubert* hearing and jury trial motion for continuance. At the hearing, Falk repeated the good-cause arguments he had made in Brown's motion for continuance. He also explained that Dr. Goodman could be available to testify at a *Daubert* hearing or a jury trial on April 27th, April 30th, May 1st, May 2nd, May 3rd, or May 4th.

The State argued against Brown's motion for continuance. It stressed that Brown had received five continuances already. It noted that it was prepared for trial that day. And it noted that the trial court's previous order setting Brown's new jury trial date for Monday, April 9, 2018, said that this was a "firm" date. Additionally, the State argued that the trial court should deny Brown's motion for continuance because Dr. Goodman's proposed testimony did not constitute a valid expert opinion under *Daubert*. Specifically, it repeated its assertion that the effects of drunkenness were within the common knowledge of the jury. And it further argued that Dr. Goodman's proposed expert testimony constituted untested and unreliable "junk science."

After the State made this argument, Falk argued that the trial court could not consider the State's *Daubert* motion "without putting on evidence for the Court to consider." The trial court agreed with Falk that it could not consider the State's *Daubert* motion at that time because Dr. Goodman was not available to testify. Then it denied Brown's *Daubert* hearing and jury trial motion for continuance for the following reasons:

> "So the things I'm looking at are the age of this case and numerous defense continuances. And this matter needs to be tried, you know, justice delayed is justice denied. Mr. Brown needs this resolved in his life so he can move on with his life and not have this just pending over his head. And certainly the community, the witnesses, the State, the attorneys need this matter resolved.

"I understand there's complications with an expert witness who said that he was available and then changed his representation, but the fact of the matter is this matter's been pending for a lengthy period of time in which to—and there's nothing new that's been presented to me that hey, gee, all of a sudden we realized we've got this intoxication defense, something new has popped up that hasn't been available.

"There are some, I think, also, some serious concerns about whether or not Dr. Goodman's testimony will be admissible, but without a *Daubert* hearing I can't decide that one way or another. It is apparent intoxication is something that juries understand. I mean, we have intoxication evidence presented without experts all the time. And it's something that does not in any way inhibit or limit the defendant's defense of voluntary intoxication in this case. So with all that, I'm going to deny the motion for a continuance and we'll move forward with [the] jury trial."

After denying Brown's *Daubert* hearing and jury trial motion for continuance, the trial court proceeded to hold Brown's jury trial.

*Brown's Criminal Case:  Jury Trial*

During its case-in-chief, the State had M.K., T.K., Adams, Detective Simmons, Sergeant Becker, S.W., and the records custodian from the Sedgwick County Sheriff's Office testify on its behalf.

M.K. provided extended testimony about her encounter with Brown in the early morning hours of Sunday, November 27, 2016. During her testimony, M.K. indicated that she did not smell an odor of alcohol on Brown when he was inside her house. Nonetheless, on cross-examination, M.K. admitted that Brown's breath "smelled horrible." She admitted that when Brown was on top of her telling her that he wanted to have sex, she asked him if he had been drinking, to which Brown responded that he had been drinking and "smok[ing] weed." Both T.K. and Adams confirmed M.K.'s testimony that she contacted them during the early morning hours of November 27, 2016, asking them whether she should call the police given Brown's troubling behavior.

Detective Simmons primarily testified about his interview of M.K. But M.K.'s videotaped interview with Detective Simmons was not admitted into evidence by either party at trial. Additionally, during his direct examination, the State asked Detective Simmons several questions about how sexual assault victims normally behave based on his training and experience. Through that questioning, Detective Simmons vouched for M.K.'s credibility, saying that in his training and experience, the only thing "uncommon" about M.K.'s sexual assault report was how quickly she made the report. Detective Simmons further confirmed the State's question whether he had investigated cases in the past where "individuals who [were] charged with a crime use[d] intoxication as an excuse to excuse their behavior." When asked by the State, Detective Simmons agreed that individuals citing intoxication as an excuse for their behavior had never "stopped [him] from pursuing charges against [those individuals]" before.

Also, despite Brown's objection, the State successfully admitted Brown's complaint and sentencing journal entry from his Butler County simple battery conviction through Detective Simmons' testimony; it is undisputed that Detective Simmons had not investigated Brown's Butler County simple battery. The State then questioned Detective Simmons about Brown's Butler County simple battery conviction. Through that questioning, Detective Simmons testified that he did not know why Brown was charged with simple battery as opposed to sexual battery in the Butler County case. But he agreed that Brown was convicted of simple battery in his Butler County case "regardless of whether he was using drugs or alcohol during [the disputed] touching."

During his recross-examination of Detective Simmons, Falk sought to clarify this testimony. Nevertheless, the trial court sustained the State's objection to Falk's questioning after the following exchange occurred:

23

"[Falk]: Do you recall the prosecution asking you a question, on her redirect, which asked you have you ever had people who were under the influence of alcohol claim that as a defense in a case?

"[Detective Simmons]: Yes.

"[Falk]: Okay. And you responded that very way, correct?

"[Detective Simmons]: Correct.

"[Falk]: And then when she asked you if it made any difference whether my client was drunk, stoned—or excuse me, had been using marijuana or alcohol, whether that made any difference to you as a law enforcement officer, you recall that?

"[Detective Simmons]: In this case it did not, correct.

"[Falk]: Okay. And[,] but that's not what the law says —

"[The State]: Objection.

"[Falk]: —and the Judge will instruct the jury on what the law is.

"[The Trial Court]: Okay. The question that she asked was does that have anything to do with whether you're going to investigate a crime. And he said no. That's what he said, *he didn't say anything about the law says that intoxication isn't a defense and it's not a defense in this case*." (Emphasis added.)

Next, Sergeant Becker testified about arresting Brown. Over Brown's objection, the State successfully admitted *the video* of Brown's arrest into evidence through Sergeant Becker's testimony. Brown's incriminating pre-*Miranda* statements to Sergeant Becker can be heard in this video.

S.W. testified about Brown grabbing her breast without permission while at a music festival in El Dorado, Kansas, on July 30, 2017. During cross-examination, S.W. explained that the police who had arrested Brown told her that he was "drunk."

Finally, the records custodian from the Sedgwick County Sheriff's Office testified about two phone calls Brown made to his wife while in jail immediately following his arrest. In the audio recordings of those phone calls, which the State successfully admitted into evidence, Brown and his wife discussed his arrest.

24

After the State rested, Brown sought to establish his voluntary intoxication defense through the testimony of his friends Convery, Rogge, and Conner. Convery, Rogge, and Conner each testified about the amount of alcohol and marijuana they saw Brown consume throughout November 26, 2016, and in the early morning hours of November 27, 2016. They also testified about the things that made them believe that Brown was very intoxicated; this included testimony about Brown's strange behavior and apparent incontinence.

After Brown rested his case, the trial court held the jury instruction conference. At the conference, the trial court granted Brown's request to instruct the jury on sexual battery as a lesser included offense of aggravated sexual battery over the State's objection. Also, after explaining that it was "struggling with" whether to give the jury an instruction on voluntary intoxication, the trial court ultimately granted Brown's request to instruct the jury on voluntary intoxication as a defense to aggravated burglary and aggravated sexual battery charges.

During the State's closing arguments, the prosecutor argued that Brown's statements and behavior established that Brown had the ability to form the necessary intent to commit the aggravated burglary and the aggravated sexual battery of M.K. In doing so, the prosecutor highlighted Brown's incriminating pre-*Miranda* statements to Sergeant Becker, questioning how Brown could remember that he "'didn't take [his] clothes off'" and "apologized to [M.K.]" if he was so intoxicated that he was "really blacked out."

Also, the prosecutor told the jury the following about the sexual battery instruction as a possible lesser included offense of the aggravated sexual battery charge and the voluntary intoxication instruction as a possible defense to the aggravated sexual battery charge:

25

"The lesser does not apply here. . . . Because the sexual battery is simply a minimization of what happened. That's all it is. It takes away the force and the fear that [M.K.] endured.

"So if you believe [M.K.], and if you agree that the State did prove up the aggravated sexual battery, you don't even have to consider the sexual battery. Because your instructions are going to say, if you feel like we proved the agg—the agg of the sexual battery, the aggravated part, you don't even get to the next page. *You don't have to go there. Just skip to the next page. You don't have to look at it. Okay. You don't—you get to skip over. So you don't have to consider it. So we're asking that you check the guilty boxes on all the aggravated.*

"Now, you are going to have instructions and you are probably going to hear a whole lot about this—involuntary intoxication. *Voluntary intoxication 'may'—that's the big fat word there you need to hone in on.* It may be a defense to the charges. Okay. 'When intoxication impairs the defendant's faculties to the extent that he was incapable of forming the necessary intent to arouse or satisfy the sexual desires of himself.'

"*All right. You do not have to do this. You do not have to consider this. Okay. It is in there, but you don't have to do it.* This is where the rubber meets the road, folks. *This is where the Constitution comes into play and you are the jury of his peers and you guys decide are you buying this. Okay. Do you buy this? That he was so hammered that he didn't know what he's doing. Do you really think that's the case here or do you think it's a big fat excuse? You guys get to decide. Okay.*

"*Because essentially, it's a 'may.' It is permissive within the law. It is not a 'shall,' like you have to consider it. You can skip it if you want, but it isn't there.* Do you buy that he was too drunk to form sexual intent? He is in her bedroom saying, 'I want to have sex with you,' humping her with an erection. How does he not have the sexual intent? *We don't even know how drunk he was. Was he probably drunk? Yeah. So what.*

. . . .

"People get drunk all the time. Does everybody that gets drunk go and commit sexual batteries or aggravated sexual batteries or aggravated sexual burglaries?" (Emphases added.)

During Brown's closing argument, Brown's attorney stressed that being drunk was not an excuse for his behavior but it was a legal defense if the evidence established that

he could not form the necessary specific intent to commit an aggravated burglary, aggravated sexual battery, or sexual battery against M.K. Brown then recounted the evidence of his alcohol and marijuana consumption before entering M.K.'s house. He asserted that the evidence of his alcohol and marijuana consumption, coupled with the evidence that he was not "in control of [his] faculties," proved that he was incapable of forming the specific intent needed to commit any crime against M.K.

In her rebuttal to Brown's closing argument, however, the prosecutor first told the jury that "alcohol doesn't make you do anything." Instead, "[a]lcohol makes it easier to do the things you already want to do." The prosecutor then closed her rebuttal argument by making the following statements to the jury:

> "[T]he bottom line is *when [Brown's] drinking he hurts people*, and he commits crimes, and you decide *if you are okay with that and if being drunk is a good enough excuse for that. You decide if you want to just brush it under the rug or not.*
> . . . .
> "[Brown was] not obliterated to where he's like slobbering drunk. Like, a mess. That's not the evidence. That is not the evidence before you. *He was conscious, he had a conscious objective*. He meets every definition of intent. He intended to [do] what he did.
> "Now, you may have an idea of what you think needs to happen. Okay. You may have an idea of what needs to happen to the defendant in the future or whatever. Now, I remember in jury selection we talked about the fact that you are not responsible for that piece of it. You don't have a part of that. Okay. *And you're lucky that you don't, so unburden yourself from that. The only thing that you have to decide is guilty or not guilty. That's it. That's it. The judge has the hard job of deciding what happens next. Okay. But what happens next part is the hardest part really. The judge will have all the information before him. Remember we talked about in jury selection there are things you get to know, the judge will know everything. He'll have all [the] information when it's time to decide what happens next.*
> ". . . Trust the judge to figure that out. So go back there and the State is asking for you to go back there, and on the verdict form, check guilty on aggravated burglary and aggravated sexual battery. *You can skip the sexual battery because remember that is a*

27

*minimization of what happened to [M.K.]. Okay. That is not what happened here. That's not even what's charged. So we're asking you to skip over that one and just everything that says aggravated, check guilty. That's what we're asking for you to do. You can take as much time as you want or as little time as you want. Okay. And zoom on down the road.*" (Emphases added.)

Shortly afterwards, the jury found Brown guilty of aggravated burglary and aggravated sexual battery.

*Brown's Criminal Case:  Postconviction Events*

Before sentencing, Brown moved for a new trial, for judgment of acquittal, and for a downward dispositional departure. Among other arguments in his new trial motion, Brown challenged the trial court's denial of his motion for continuance. Brown alleged that had Dr. Goodman been able to testify at his trial, he would have used the Kansas Department of Health and Environment's Breath Alcohol Training Manual and the Widmark formula to estimate his blood alcohol content. Brown alleged by using the preceding technical standards, Dr. Goodman determined that his blood alcohol content when he entered M.K.'s house was between .300 and .500.

At Brown's sentencing, however, the trial court denied each of Brown's motions. It then imposed a total controlling sentence of 93 months' imprisonment followed by lifetime postrelease supervision.

Brown timely appealed his convictions and sentence to us. After docketing his appeal, Brown's appellate counsel asked us to remand his case to the trial court for a hearing in accordance with *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986), to determine if Hoeme and Falk had provided Brown ineffective assistance of trial counsel. We granted this request, remanding Brown's case to the trial court for a *Van Cleave* hearing.

28

At the *Van Cleave* hearing, Brown questioned both Hoeme and Falk about their various actions and inactions while representing him. In the end, the trial court rejected each of Brown's ineffective assistance of counsel claims against Hoeme and Falk. Brown then timely appealed the denial of his ineffective assistance of counsel claims to us.

*Did the Prosecutor Commit Reversible Error During Closing Arguments?*

Brown argues that several of the prosecutor's comments during closing arguments constituted prosecutorial error. Although Brown challenges several of the prosecutor's comments, Brown's complaints about the prosecutor's closing arguments can be broken into three categories: First, Brown argues that the prosecutor's comments describing his voluntary intoxication defense as an excuse both misstated the law and inflamed the passions and prejudices of the jury. Second, Brown argues that the prosecutor's comments about skipping over jury instructions on sexual battery as a lesser included offense and on voluntary intoxication misstated the law. Third, Brown argues that the prosecutor not only indicated that facts were not in evidence but also diluted the role of the jury when she said that the judge had the hardest job in his criminal trial in deciding Brown's sentence. Brown concludes that the preceding errors cannot be deemed harmless because the prosecutor's erroneous comments undermined his voluntary intoxication defense.

The State generally responds that Brown has taken the prosecutor's comments out of context. According to the State, when viewed in context, the prosecutor's comments during closing arguments were proper. Alternatively, the State contends that any error stemming from the prosecutor's improper comments was harmless beyond a reasonable doubt.

29

*The Prosecutor Erred by Calling Brown's Voluntary Intoxication Defense a "Big Fat Excuse"*

An appellate court reviews a defendant's claim of prosecutorial error in two steps: First, an "appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Second, if error is established under the first step, an appellate court must determine whether the error was harmless beyond a reasonable doubt under the constitutional harmless error test. 305 Kan. at 109. Of note, we will review a defendant's claim of prosecutorial error made during closing arguments even if the defendant raises the error for the first time on appeal. *State v. Butler*, 307 Kan. 831, 864, 416 P.3d 116 (2018).

It is well-known that it is error "for a prosecutor to comment on facts not in evidence, to divert the jury's attention from its role as factfinder, or to make comments that serve no purpose other than to inflame the passions and prejudices of the jury." *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013). In *State v. Pratt*, 255 Kan. 767, 768-69, 876 P.2d 1390 (1994), our Supreme Court held:  "Voluntary intoxication is *neither an excuse for nor a justification of crime*. In specific intent crimes, however, voluntary intoxication may be raised as a defense." (Emphasis added.)

Brown alleges that the prosecutor inflamed the passions and prejudices of the jury by suggesting that his voluntary intoxication was "a big fat excuse." He also takes issue with the prosecutor's suggestion that acceptance of his voluntary intoxication defense would be akin to "brush[ing his conduct] under the rug." The State responds that when viewed in context, the prosecutor's "'big fat excuse' comment was not denigrating the defense; rather, it was part of a rhetorical question to the jury asking them to evaluate [Brown's] claimed intoxication." We disagree.

The central theme in the State's prosecution was whether the jury was going to excuse Brown's conduct because of his intoxication. And the prosecutor's intended theme is clear. As indicated in the facts section of our opinion, when the prosecutor ended her redirect examination of Detective Simmons, she specifically asked Detective Simmons this question: "Detective, in your training and experience have you had individuals who are charged with a crime use intoxication as an excuse to excuse their behavior?" Detective Simmons responded that he "had [intoxication] used before" and agreed with the State that a person's alleged intoxication had never "stopped [him] from pursuing charges against [that] person." The prosecutor also elicited testimony from Detective Simmons that Brown had been convicted of simple battery in his Butler County case "regardless of whether he was using drugs or alcohol during [the disputed] touching."

When Brown's attorney, in his recross-examination of Detective Simmons, sought to clarify Detective Simmons' testimony about having pursued charges against people regardless if they had "use[d] intoxication as an excuse to excuse their behavior," the prosecutor objected to this line of questioning. Although the prosecutor provided no basis for her objection, the trial court sustained the prosecutor's objection. In sustaining the objection, the trial court stated in part: "[Detective Simmons] didn't say anything about the law says that intoxication isn't a defense *and it's not a defense in this case*." (Emphasis added.) The trial court here erred when it sustained the prosecutor's objection and when it ruled that "[intoxication is] not a defense in this case." This is a misstatement of controlling law which we will discuss later in this opinion.

Turning to the prosecutor's closing argument, we also note that before the prosecutor told the jury that it could skip the instructions on sexual battery as a lesser included offense and the instruction on voluntary intoxication, the prosecutor discussed Brown's Butler County simple battery conviction. In doing so, the prosecutor asked the jury to compare Brown's Butler County simple battery conviction with this case. Then,

31

the prosecutor told the jury that during the Butler County "battery," Brown had grabbed S.W.'s breast while intoxicated "just like he [did] in the [M.K. altercation]." The prosecutor then told the jury that Brown's conduct in this case was more serious than the lesser included offense of sexual battery:

> "Sexual battery is in your instructions. Okay. It's like the tinier version of aggravated sexual battery. Okay. The difference is there is no force or fear required with a sexual battery. Okay. That completely minimizes what happened to [M.K.] Completely. An example of a sexual battery would be like grabbing someone's breast. Okay, that would be like an example of a sexual battery. Okay. What happened to [M.K.] is way more than that. She endured at least 30 minutes she believes of the defendant on top of her. . . . She is terrified. That is not sexual battery, folks, and it's the State's opinion that you could just skip that one."

Afterwards, the prosecutor asked the jury about Brown's voluntary intoxication defense and asked the jury if it believed Brown's voluntary intoxication defense: "Do you really think that's the case here or do you think it's a big fat excuse? You guys get to decide. Okay."

During his closing arguments, Brown's attorney sought to clarify that Brown was not arguing that his voluntary intoxication was an excuse for his inappropriate behavior. Instead, Brown's attorney pointed out to the jury the following: "[A]nother factor that can influence intent and that's the voluntary intoxication instruction that was given. Is being drunk an excuse? No. It is not. Okay. You are still responsible for your actions even if you don't remember. The difference is criminal culpability." But in the prosecutor's rebuttal to Brown's closing argument, the prosecutor told the jury that "the bottom line is when Brown is drinking he hurts people, and he commits crimes, and you decide if you are okay with that and if being drunk is a good enough excuse for that. You decide if you want to just brush it under the rug or not."

32

The prosecutor's comments here are highly disparaging and intended to inflame the jury to convict Brown. To begin with, our Supreme Court precedent in *Pratt* establishes that "[v]oluntary intoxication is neither an excuse for nor a justification of crime." 255 Kan. at 768. Voluntary intoxication is instead a valid legal defense. 255 Kan. at 768-69. Here, the prosecutor improperly told the jury that Brown's voluntary intoxication defense was equivalent to an excuse to harm someone. This is clearly a misstatement of the law. Cf. *State v. Schreiner*, 46 Kan. App. 2d 778, 795-96, 264 P.3d 1033 (2011) (holding that the prosecutor's request to the jury to "find that intoxication is not an excuse for the behavior" while technically a correct statement of the law was likely confusing to the jury).

Also, the prosecutor injected a theory of moral sentiments in the jury's decision-making process by referring to Brown's voluntary intoxication defense as "a big fat excuse." First, the prosecutor implied that the jury would absolve Brown of his inappropriate behavior if it accepted his voluntary intoxication defense. The prosecutor then offered to the jury a false disjunction composed of two options: the jury could decide to find Brown guilty of the aggravated burglary and aggravated sexual battery of M.K. or the jury could decide to "'brush [Brown's inappropriate conduct] under the rug.'" The prosecutor, however, failed to tell the jury that another alternative existed: the jury could decide to convict Brown of sexual battery as the lesser included offense of aggravated sexual battery.

Also, the prosecutor's argument implicitly invited the jurors to protect society against such unfairness based on Brown's voluntary intoxication defense. The prosecutor's argument implied the unfairness which would result if the jury condoned Brown's detestable behavior by falling for or adopting his voluntary intoxication defense. Indeed, the prosecutor declared: "[T]he bottom line is when Brown is drinking he hurts people, and he commits crimes, and you decide if you are okay with that and if being drunk is a good enough excuse for that. You decide if you want to just brush it under the

33

rug or not." This kind of argument would be a snare to the moral sentiments of the jurors and to what they believe is just, right, or acceptable in society. As a result, the prosecutor's argument can be reconstructed into this categorical syllogism:

Major premise: No defenses excusing bad behavior are to be trusted.

Minor premise: A voluntary intoxication defense excuses bad behavior.

Conclusion: Therefore, a voluntary intoxication defense is not to be trusted.

Obviously, there is no purpose or support for this syllogistic argument except to inflame the passions and prejudices of the jurors.

Next, the prosecutor's use of the word "excuse" taken together with her description of Brown's Butler County simple battery conviction and what conduct constituted a sexual battery was misleading. Both through Detective Simmons' testimony as well as in her closing argument, the prosecutor emphasized that Brown was charged and convicted of his Butler County simple battery even though he was drunk when he committed that crime. Because simple battery is a general intent crime, however, Brown never had the option to assert voluntary intoxication as a defense to his crime. See K.S.A. 2020 Supp. 21-5413(a)(2). But the fact that Brown could not raise a voluntary intoxication defense to his Butler County simple battery charge was never explained to the jury.

In fact, the prosecutor described Brown's nonconsensual grabbing of S.W.'s breast as a "battery" and then told the jury that the act of grabbing someone's breast without consent constituted a "sexual battery." Because a sexual battery also requires a person to act "with the intent to arouse or satisfy the sexual desires of the offender or another," however, it is a specific intent crime for which voluntary intoxication is a valid legal defense. See K.S.A. 2020 Supp. 21-5505(a).

34

Thus, not only did the prosecutor emphasize that Brown was convicted of a sexual battery in the Butler County case despite being drunk, she implied that he could have raised a voluntary intoxication defense to that battery. As a result, the jury may have believed that Brown had tried but failed when raising a voluntary intoxication "excuse" to his Butler County simple battery charge; or, it may have believed that Brown had pleaded guilty instead of arguing voluntary intoxication because he knew such a defense would be futile in his Butler County case. Either way, the jury could have construed Brown's Butler County simple battery conviction, despite his undisputed drunkenness when he committed that crime, as evidence that the jury should reject his voluntary intoxication "excuse" in this case too.

Thus, it is readily apparent that the prosecutor erred when she referred to Brown's voluntary intoxication defense as "a big fat" excuse. Voluntary intoxication was Brown's valid legal defense, not an excuse, and the jury would not have "brush[ed]" Brown's inappropriate behavior "under the rug" had it accepted that defense.

In its brief, the State contends that even if we determine that the prosecutor's comments were erroneous, each of the prosecutor's comments were harmless (1) because overwhelming evidence supported that Brown had the specific intent necessary to commit an aggravated burglary and aggravated sexual battery against M.K. and (2) because the trial court instructed the jury to follow all of the jury instructions.

As for the State's contention that the prosecutor's "big fat excuse" related comments were harmless because the trial court instructed the jury to follow all the jury instructions, the State misjudges the seriousness of the prosecutor's comments. As previously explained, the prosecutor's comments directed the jury's focus away from whether Brown was capable of acting with the intent to arouse or satisfy the sexual desires of himself or of M.K. to an improper morality question. That is, whether the jury should excuse Brown for his inappropriate conduct just because he was drunk.

35

Moreover, the State's argument ignores one of the more confusing things that happened during Brown's jury trial. When we consider harmlessness under the constitutional harmless error test, we consider the error in light of the entire record. Also, under the constitutional harmless error test, the party benefiting from the error must prove beyond a reasonable doubt that the error complained of did not affect the jury's verdict in light of the entire record. That is, the party benefiting from the error must establish that there is no reasonable possibility that the error contributed to the jury's verdict. *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011). For reasons unclear, when the trial court sustained the State's objection to Brown's attorney's questioning of Detective Simmons, the trial court explicitly stated the following: "[Detective Simmons] didn't say anything about the law says that intoxication isn't a defense and it's not a defense in this case." There can be no doubt that this misstatement of law by the trial court, in and of itself, prejudiced Brown. This misstatement of the law told the jury that even the judge does not believe that voluntary intoxication constitutes a defense in Brown's case.

Also, the timing of the trial court's misstatement heightened its prejudicial effect. This is because the trial court made this misstatement while sustaining the State's objection to Brown's attorney's questioning of Detective Simmons, which Brown's attorney undertook in an effort to clarify Detective Simmons' redirect examination testimony—implying that voluntary intoxication is an excuse rather than a valid legal defense to the State's charges against Brown.

The timing of the prosecutor's disputed "excuse" comments is also important. After the prosecutor made the "big fat excuse" comment during closing argument, Brown's attorney sought to explain to the jury that Brown was not raising voluntary intoxication as an excuse. Yet again, during her rebuttal argument to the jury, the prosecutor told the jury "you decide if you are okay with [Brown hurting people when he is drunk] and if being drunk is a good enough excuse for that. You decide if you want to

36

just brush it under the rug or not." As a result, one of the last things that the prosecutor told the jury was that to accept Brown's voluntary intoxication defense would be akin to brushing Brown's inappropriate behavior under the rug. Because the prosecutor made the preceding comment during her rebuttal, the timing of the prosecutor's inappropriate comments magnified its prejudicial effect. See *Zapata v. Vasquez*, 788 F.3d 1106, 1122 (9th Cir. 2015) (Holding that "[t]he presentation of improper material at the end of trial 'magnifie[s]' its prejudicial effect because it is 'freshest in the mind of the jury when [it] retire[s] to deliberate.' [Citation omitted.]").

In short, the trial court bolstered the prosecutor's theme that Brown's voluntary intoxication defense did not excuse his conduct in this case. Thus, although the trial court instructed the jury to follow all the jury instructions, it is highly likely that the jury had already discredited Brown's voluntary intoxication defense based on the prosecutor's and trial court's misstatements of law by the time it received those instructions. Under these facts, the State cannot prove that the prosecutor's errant comments referring to Brown's voluntary intoxication defense as "a big fat excuse" were harmless beyond a reasonable doubt.

### *The Prosecutor Erred by Telling the Jury to Skip Instructions*

It is a well-known rule that "[a] prosecutor's misstatement of law constitutes prosecutorial error." *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019).

In arguing that the prosecutor erred by telling the jury to skip the instructions on sexual battery as a lesser included offense and voluntary intoxication, Brown asserts that his case is comparable to *State v. McCorkendale*, 267 Kan. 263, 282, 979 P.2d 1239 (1999), *disapproved of on other grounds by State v. King*, 288 Kan. 333, 204 P.3d 585 (2009). There, our Supreme Court considered the following comments made by the

prosecutor during closing arguments regarding McCorkendale's voluntary intoxication defense against his first-degree premeditated murder charge:

"There's an instruction on involuntary manslaughter. There's one on voluntary manslaughter. I'm asking that you do not even consider those. He is charged with first degree intentional premeditated murder. *You have proof beyond a reasonable doubt that that's what this case is about. You don't even have to consider those lessers. Those are thrown in to confuse you; don't consider them.*'

"'He's argued, and there's an instruction on intoxication as a defense, and I'm not sure if he's saying now, well, yeah, I did do first degree murder, excuse it because I was intoxicated, but nonetheless, there's an instruction in there that *I'm going to ask that you totally disregard* because he was not intoxicated to the point that he didn't know what he was doing and that's what the instruction basically says. In order for you to think that's a defense to first degree murder, you have to think that he was totally out of it because he was drinking, he wasn't aware of what was going on in his surroundings.' (Emphasis added.)" 267 Kan. at 282.

Our Supreme Court decided *McCorkendale* under our previous standard for reviewing prosecutorial wrongdoings—the prosecutorial misconduct test. Regardless, our Supreme Court explained that it "[had] no hesitancy in concluding that the above remarks by the State were improper":

"Urging the jury not to consider instructions given by the court because they were thrown in to confuse the jury and asking the jury to totally disregard instructions given by the court constitutes prosecutorial misconduct. While the State asks this court to consider the comments in context as a statement that the jury need not consider the lesser included offenses because the evidence establishes first-degree premeditated murder, and that the voluntary intoxication instruction should be ignored because there was no evidence to support its consideration, the remarks improperly advise the jury to ignore the trial court's instruction. The effect of the State's comment was not to simply persuade the jury that the evidence had fallen short of establishing any of the lesser included offenses or failed to establish intoxication in accord with the instructions given. Rather, the argument

38

improperly told the jury to disregard the trial court's instructions in a given area." 267 Kan. at 282.

The State responds that Brown's comparison of the prosecutor's comments to skip the instructions on sexual battery as a lesser included offense and on voluntary intoxication during closing arguments in his case are distinguishable from the prosecutor's comments during McCorkendale's closing arguments. Specifically, the State alleges the prosecutor's comments in this case are distinguishable because unlike in *McCorkendale*, the prosecutor here "did not flatly tell the jury to disregard the court's instructions." Nevertheless, the State's characterization of the prosecutor's comments is wrong and misleading.

When discussing the lesser included offense of sexual battery instruction, the prosecutor explicitly told the jury the following:

> "So if you believe [M.K.], and if you agree that the State did prove up the aggravated sexual battery, you don't even have to consider sexual battery. Because your instructions are going to say, if you feel like we proved the agg—the agg of the sexual battery, the aggravated part, *you don't even get to the next. You don't have to go there. Just skip to the next page. You don't have to look at it. Okay. You don't—you get to skip over. So you don't have to consider it. So we're asking that you check the guilty boxes on all the aggravated*." (Emphasis added.)

Telling the jury that it "[does not] have to look at [the lesser included offense instruction]" and instead can "[j]ust skip to the next page" is telling the jury to disregard the court's instructions. To interpret the prosecutor's comments in any other way would be patently unreasonable.

As for the prosecutor's comments concerning the voluntary intoxication instruction, immediately after telling the jury that it "[did not] have to look at" the lesser

39

included offense instruction, the prosecutor told the jury that voluntary intoxication "may" be a defense to the State's charges against Brown. This is a correct statement of the law. See K.S.A. 2020 Supp. 21-5205(b). Nevertheless, immediately after saying that voluntary intoxication "may" be a defense to Brown's aggravated burglary and aggravated sexual battery charges, the prosecutor told the jury the following:

> "*All right. You do not have to do this. You do not have to consider this. Okay. It is in there, but you don't have to do it.* This is where the rubber meets the road, folks. This is where the Constitution comes into play and you are the jury of his peers and you guys decide are you buying this. Okay. Do you buy this? That he was so hammered that he didn't know what he's doing. Do you really think that's the case here or do you think it's a big fat excuse? You guys get to decide. Okay.
> "Because essentially, it's a 'may.' *It is permissive within the law. It is not a 'shall,' like you have to consider it. You can skip it if you want*, but it isn't there." (Emphasis added.)

Once again, telling the jury that it "[does] not have to consider" and "can skip" the instruction on voluntary intoxication is telling the jury that it can disregard the court's instructions. This is the only reasonable way to interpret the prosecutor's comments.

The trial court's primary instruction to the jury was that "it [was its] duty to consider and follow all of the instructions." Afterwards, the trial court instructed the jury on sexual battery as a lesser included offense and voluntary intoxication as a defense. Just like the prosecutor in *McCorkendale*, by telling the jury to ignore the instructions on sexual battery as a lesser included offense and on voluntary intoxication as a defense, the prosecutor in this case did not simply try to persuade the jury that the evidence supported convicting Brown of aggravated sexual battery as opposed to sexual battery as a lesser included offense. Nor did the prosecutor simply try to argue that the evidence of Brown's voluntary intoxication defense was unpersuasive. Instead, the prosecutor improperly told the jury to disregard the trial court's instructions on sexual battery and voluntary

40

intoxication. Simply put, the prosecutor's comments about skipping the instructions constituted a misstatement of law.

Additionally, the prosecutor's discussion of how voluntary intoxication "may" be a defense to Brown's aggravated burglary and aggravated sexual battery charges makes the prosecutor's comment about skipping the voluntary intoxication instruction even more egregious than the comments at issue in *McCorkendale*. The prosecutor told the jury that *the law* allowed it to ignore Brown's voluntary intoxication defense. As a result, the prosecutor undermined Brown's right under both the United States Constitution and the Kansas Constitution to present his defense theory. See *State v. Pennington*, 281 Kan. 426, 439, 132 P.3d 902 (2006).

Regarding harmlessness, the prosecutor's directions to the jury to skip the instructions on sexual battery as a lesser included offense and voluntary intoxication as a defense only compounded the harm caused by the prosecutor's "big fat excuse" comment detailed in the preceding question. Also, the prosecutor repeated her directions to "skip over" the sexual battery as a lesser included offense instruction during her rebuttal. Because this was one of the last things the jury heard before it began deliberating, the timing of the prosecutor's comments magnifies the error. See *Zapata,* 788 F.3d at 1122. In short, the prosecutor's directions to the jury to skip the instructions on sexual battery as a lesser included offense and voluntary intoxication as a defense were not harmless beyond a reasonable doubt.

*The Prosecutor Erred by Telling the Jury That the Judge Had the "Hard Job"*

In his final claim of prosecutorial error, Brown asserts that the prosecutor erred when she told the jury that the trial "judge ha[d] the hard job of deciding what happens next." In making his argument, Brown notes that in *State v. Brinklow*, 288 Kan. 39, 50, 200 P.3d 1225 (2009), our Supreme Court stated that prosecutors err if they make

41

comments that dilute the State's burden of proof during closing arguments. He then contends that the prosecutor's comment that the trial "judge ha[d] the hard job of deciding what happens next," diluted the role of the jury by "minimiz[ing] [its] responsibility in determining [Brown's] guilt beyond a reasonable doubt." Brown also argues that the prosecutor's comment that "[t]he judge will have all the information before him" when deciding "what happens next" insinuated that there were important facts not in evidence.

The State counters that the prosecutor did not dilute the role of the jury because she was merely "reminding [the jury] that [its] only concern was deciding whether [Brown] was guilty or not guilty." As for the prosecutor's comment about the trial judge having "all the information before him" when he decided "what happens next," the State concedes that "[t]he allusion to the fact that the jury did not have all the information may have been erroneous." But the State further contends that in context, none of the prosecutor's disputed comments were erroneous because she was merely paraphrasing one of the court's jury instructions. The State's arguments, however, are flawed.

To review, near the very end of her rebuttal to Brown's closing argument, the prosecutor told the jury the following:

> "Now, you may have an idea of what you think needs to happen. Okay. You may have an idea of what needs to happen to the defendant in the future or whatever. Now, I remember in jury selection we talked about the fact that you are not responsible for that piece of it. You don't have a part of that. Okay. *And you're lucky that you don't, so unburden yourself from that. The only thing that you have to decide is guilty or not guilty. That's it. That's it. The judge has the hard job of deciding what happens next. Okay. But what happens next part is the hardest part really. The judge will have all the information before him. Remember we talked about in jury selection there are things you get to know, the judge will know everything. He'll have all [the] information when it's time to decide what happens next.*
>
> ". . . Trust the judge to figure that out. So go back there and the State is asking for you to go back there, and on the verdict form, check guilty on aggravated burglary and

aggravated sexual battery. *You can skip the sexual battery because remember that is a minimization of what happened to* [*M.K.*] *Okay. That is not what happened here. That's not even what's charged. So we're asking you to skip over that one and just everything that says aggravated, check guilty.* That's what we're asking for you to do. You can take as much time as you want *or as little time as you want*. Okay. *And zoom on down the road*." (Emphases added.)

Of note, although the prosecutor never explicitly stated that she was discussing sentencing when referring to "what happens next," it is readily apparent from the context of her statement that she was talking about sentencing Brown. Also, in the disputed comment, the prosecutor states that she is referencing a discussion that happened during jury selection. At jury selection, the prosecutor told the jury "[s]omething else that we're not allowed to talk about is sentencing."

Next, although neither party cites *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), this United States Supreme Court decision is helpful in determining whether the prosecutor erred by making the preceding comments. A jury convicted Caldwell of capital murder. Afterwards, during the penalty phase of Caldwell's case, Caldwell's defense attorney told the jury that it was in control of Caldwell's fate. The prosecutor responded to this argument by telling the jury that its decision whether to recommend the death penalty was reviewable:

> "'[Defense counsel] said 'Thou shalt not kill.' If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.'" 472 U.S. at 325-26.

The jury ultimately sentenced Caldwell to death.

Caldwell appealed to the United States Supreme Court, arguing that the prosecutor's comments were inconsistent with the Eighth Amendment to the United States Constitution's heightened reliability requirement in the determination of a death penalty sentence. The United States Supreme Court agreed: "[W]e conclude that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 329-30. It then vacated Caldwell's death penalty sentence because by "suggest[ing] that the responsibility for any ultimate determination of death will rest with others," the prosecutor created "an intolerable danger that the jury [would] in fact choose to minimize the importance of its role." 472 U.S. at 333.

Clearly, because this is not a capital punishment case, the prosecutor's comments here do not receive the same heightened scrutiny as the prosecutor's comments in Caldwell's case. Still, the *Caldwell* decision indicates that a prosecutor errs when he or she implies that the jury's verdict is reviewable or that the jury is not the ultimate decision-maker. Yet, this is exactly what the prosecutor did in this case by telling the jury that the trial "judge ha[d] the hard job of deciding what happen[ed] next."

The State's contention that the prosecutor was merely "reminding [the jury] that [its] only concern was deciding whether [Brown] was guilty or not guilty" ignores the context of the prosecutor's comments. Although the prosecutor told the jury "[t]he only thing that [it had] to decide was guilty or not guilty," it then immediately directed the jury's attention to the fact that the trial judge "ha[d] the hard job of deciding what happens next." In effect, the prosecutor told the jury not to worry about convicting Brown of aggravated burglary and aggravated sexual battery because the judge was ultimately responsible for determining Brown's punishment. Also, if the prosecutor wanted the jury to focus solely on whether to convict Brown, there was no need to bring up sentencing.

44

And there was certainly no need to tell the jury that the trial judge would also have the benefit of having "all the information before him" when he "decide[d] what happens next."

It is also important to note that after the prosecutor told the jury that the trial judge "ha[d] the hard job of deciding what happens next," the prosecutor repeated that the jury could "skip over" the sexual battery as a lesser included offense instruction because "[t]hat's not even what's charged." *And* then the prosecutor added that the jury could "take as much time as [it] want[ed] or as little time as [it] want[ed]" before "zoom[ing] on down the road." Between telling the jury to skip jury instructions, telling the jury it could take as little time as it wanted in its deliberations, and telling the jury that the trial "judge ha[d] the hard job of deciding what happens next," there can be little doubt that the jury believed it was playing an insignificant role in Brown's criminal case.

Also, the State's contention that the prosecutor was merely paraphrasing jury instructions when she made the disputed comments is unconvincing. Based on the State's citation, it seems the State believes that the prosecutor was paraphrasing the trial court's first jury instruction. But the trial court's first jury instruction does not state that it would have all the information before it when sentencing. The only language in the instruction that involves evidence is that the jury "should consider everything admitted into evidence" and consider nothing not admitted into evidence. Also, this instruction explicitly states that "[t]he disposition of the case thereafter is not to be considered in arriving at your verdict."

In summary, a prosecutor must limit his or her closing comments on the evidence of the record and the inference that may reasonably be drawn from them. Here, the prosecutor willingly walked along the cliff of reversible error. And the prosecutor walked over that cliff when she failed to separate proper and legitimate arguments from the disparaging comments and misstatements of law intended to inflame the jury to convict

45

Brown. Indeed, the prosecutor minimized the jury's role by suggesting that the trial "judge ha[d] the hard job of deciding what happens next" to Brown. The prosecutor also minimized the role of the jury by stating that it could rush through deliberations by skipping jury instructions, by taking as little time as it wanted during deliberations, and by "zoom[ing] on down the road." In making those comments, the prosecutor implied that the jurors' decision was insignificant when compared to the trial judge's larger responsibility of deciding Brown's punishment. In the context of the prosecutor's other erroneous comments during closing arguments, as well as the prosecutor's and the trial court's misstatement of law before the jury—that voluntary intoxication was not a defense in Brown's case—the prosecutor's actions were not harmless beyond a reasonable doubt.

We thus reverse Brown's aggravated burglary and aggravated sexual battery convictions and remand to the trial court for a new trial.

*Does the Admission of Brown's Incriminating Pre-*Miranda *Statements at Trial Require Reversal of His Convictions?*

To review, at the end of the State's *Jackson v. Denno* hearing, the trial court ruled that the State could admit Brown's incriminating pre-*Miranda* statements to Sergeant Becker into evidence at trial because Brown's incriminating pre-*Miranda* statements were not the result of a custodial interrogation. Then, at Brown's jury trial, over Brown's objection, the State admitted into evidence Sergeant Becker's bodycam video which showed Brown making the incriminating pre-*Miranda* statements to Sergeant Becker. Again, the incriminating pre-*Miranda* statements indicated that Brown understood why the police were arresting him and that he did not expect the police to come because "she [M.K.] didn't say anything," because "she didn't say she was going to call the cops," and because he "didn't really do anything" as he never "[took his] clothes off."

46

On appeal, Brown challenges the trial court's ruling that his incriminating pre-*Miranda* statements to Sergeant Becker were not the result of custodial interrogation. Brown first notes that at the *Jackson v. Denno* hearing, the State conceded that he was in custody. He then argues that caselaw establishes that his incriminating pre-*Miranda* statements were in response to Sergeant Becker's interrogation. Finally, Brown concludes that the erroneous admission of his incriminating pre-*Miranda* statements was not harmless. Brown points out that the prosecutor relied on his incriminating pre-*Miranda* statements during closing arguments to undermine his voluntary intoxication defense.

As it did below, the State concedes that Brown was in custody when he made his incriminating pre-*Miranda* statements to Sergeant Becker. Even so, the State argues that Sergeant Becker was not interrogating Brown because Sergeant Becker only made "statements" to Brown as opposed to "questioning" Brown. It further argues that Sergeant Becker was not interrogating Brown because his statements were "not necessarily likely to elicit an incriminating response." Alternatively, the State asserts that any error from the trial court's admission of Brown's incriminating pre-*Miranda* statements to Sergeant Becker was harmless for two reasons: First, it contends any error was harmless because Brown's "more incriminating statements were spontaneous." Second, it contends that any error was harmless because the evidence was overwhelming supporting Brown's aggravated burglary and aggravated sexual battery convictions.

*Custodial Interrogation Law*

Before considering the parties' respective arguments, however, it is first important for us to review the law on custodial interrogations.

"'The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent.'" *State v. Walker*, 276 Kan. 939, 944, 80 P.3d

47

1132 (2003) (citing *Miranda*, 384 U.S. at 479). In *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the United States Supreme Court held that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Thus, the *Miranda* safeguards are triggered "'when an accused person is (1) in custody and (2) subject to interrogation.'" *State v. Guein*, 309 Kan. 1245, 1253, 444 P.3d 340 (2019). This, in turn, means that when a law enforcement officer obtains incriminating pre-*Miranda* statements from a defendant while that defendant is in custody and under interrogation, that officer violates that defendant's rights under the Fifth Amendment. See *State v. Palacio*, 309 Kan. 1075, 1081-82, 442 P.3d 466 (2019) (citing *Innis*, 446 U.S. at 297). So incriminating pre-*Miranda* statements obtained during a custodial interrogation must be excluded from evidence. 309 Kan. at 1082.

Again, it is undisputed that Brown was in custody when he made his incriminating pre-*Miranda* statements to Sergeant Becker. Next, whether Brown's Fifth Amendment rights were violated hinges on if Sergeant Becker was interrogating Brown. To determine if an incriminating pre-*Miranda* statement resulted from interrogation, courts must consider the law enforcement officer's conduct when the defendant made the incriminating pre-*Miranda* statement: "An officer's words or actions, including explicit questioning, is interrogation only if the officer should have known that the questioning was 'reasonably likely to elicit an incriminating response from the suspect.'" *Palacio*, 309 Kan. at 1085 (quoting *Innis*, 446 U.S. at 301). "Whether words or actions are likely to elicit an incriminating response 'focuses primarily upon the perceptions of the suspect, rather than on the intent of the police.'" 309 Kan. at 1085 (quoting *Innis*, 446 U.S. at 301). Thus, the officer's disputed words or actions will constitute an interrogation if the officer should have known that the suspect would have perceived the officer's disputed words or actions as an invitation to divulge incriminating information.

When an appellate court reviews a trial court's ruling regarding the suppression of an accused's statements, an appellate court reviews the trial court's ruling under two steps: Under the first step, an appellate court reviews the trial court's factual findings for substantial competent evidence. *Guein*, 309 Kan. at 1251-52. "Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion." *State v. Schultz*, 289 Kan. 334, 340, 212 P.3d 150 (2009). While engaging in the substantial competent evidence standard of review, an appellate court does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *Guein*, 309 Kan. at 1252. Under the second step, an appellate court exercises de novo review over the trial court's legal conclusions. 309 Kan. at 1252.

If a defendant establishes that the trial court erroneously admitted evidence at trial of his or her incriminating pre-*Miranda* statement resulting from custodial interrogation, an appellate court must then consider if the erroneous admission of the defendant's incriminating pre-*Miranda* statement was harmless under the constitutional harmless error test. See *State v. Lewis*, 299 Kan. 828, 837, 326 P.3d 387 (2014). As stated earlier, under the constitutional harmless error test, the party benefiting from the error must prove beyond a reasonable doubt that the error complained of did not affect the jury's verdict in light of the entire record. That is, the party benefiting from the error must establish that there is no reasonable possibility that the error contributed to the jury's verdict. *Ward*, 292 Kan. 541, Syl. ¶ 6.

Previously, both this court and our Supreme Court have considered defendants' challenges to the admission of their incriminating pre-*Miranda* statements by arguing that their incriminating pre-*Miranda* statements stemmed from a custodial interrogation. On this question, Kansas caselaw authority can be divided generally into two categories: (1) cases involving explicit questioning by law enforcement of a defendant in custody before

Mirandizing the defendant and (2) cases involving declaratory statements made by a law enforcement officer to a defendant in custody before Mirandizing the defendant.

Kansas courts often hold that questioning under the first category constitutes custodial interrogation. For instance, in *State v. Hebert*, 277 Kan. 61, 70, 82 P.3d 470 (2004), our Supreme Court held that a law enforcement officer who asked Hebert, a murder suspect who had not yet been Mirandized, if he "'[w]ould . . . like the opportunity to tell [him his] side of the story,'" constituted custodial interrogation. And in another case, *State v. Johnson*, 46 Kan. App. 2d 387, 396, 264 P.3d 1018 (2011), we held that a law enforcement officer's pre-*Miranda* question whether Johnson "'had anything on his person that she should know about'" constituted custodial interrogation, in part, because the officer "should have known her question was reasonably likely to elicit an incriminating response." Of note, in reaching this holding, we also rejected the State's argument that the officer's question fell under the narrow exception allowing law enforcement officers to ask limited public safety-related questions before Mirandizing a defendant. 46 Kan. App. 2d at 396.

On the other hand, when deciding cases involving a law enforcement officer's declaratory statement, Kansas courts frequently affirm the trial court's admission of a defendant's incriminating pre-*Miranda* response. Although the *Palacio* decision involved whether Palacio's incriminating post-*Miranda* statements were the result of interrogation and, thus, inadmissible because a law enforcement officer continued to talk to him after he asked to speak with an attorney, our Supreme Court rejected Palacio's argument because the law enforcement officer's "declarative statements" were not an interrogation. It determined that the declarative statements were "meant to inform Palacio of the reasons he and his girlfriend were in custody" as opposed to eliciting incriminating responses. 309 Kan. at 1086.

Our Supreme Court reached a similar result in *State v. Duke*, 256 Kan. 703, 707, 887 P.2d 110 (1994). There, while transporting a handcuffed Duke to jail, a law enforcement officer told another officer that he was transporting a "'murder suspect.'" 256 Kan. at 707. The other officer responded, "'No Shit.'" 256 Kan. at 707. To which Duke replied, "'No shit, it was me'" or "'I did it.'" 256 Kan. at 707. Because our Supreme Court determined that Duke's incriminating pre-*Miranda* reply was a voluntary spontaneous statement in response to the law enforcement officer's declaratory statements, it affirmed the trial court's admission into evidence of Duke's incriminating pre-*Miranda* reply. 256 Kan. at 708-09.

Thus, there is Kansas authority addressing if pre-*Miranda* explicit questioning of a suspect by a law enforcement officer constitutes custodial interrogation and there is Kansas authority addressing if a pre-*Miranda* declaratory statement made by a law enforcement officer to a suspect constitutes custodial interrogation. Nevertheless, there seems to be no Kansas caselaw either (1) explaining when a law enforcement officer has engaged in the functional equivalent of a custodial interrogation or (2) stating examples of what sort of words or actions by a law enforcement officer are necessary to constitute a functional equivalent of a custodial interrogation. There also seems to be no Kansas case with facts comparable to this case, that is, where the law enforcement officer asked a defendant, "I'm assuming you know what this is about" and "I'm assuming you were kind of expecting us."

In his brief, though, Brown compares the facts of his case to cases from other jurisdictions. Specifically, Brown compares the facts of his case to the facts at issue in the United States Supreme Court case *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985), the Wisconsin Court of Appeals case *Wisconsin v. Cleaver*, No. 2004AP169-CR, 2005 WL 2757478 (Wis. Ct. App. 2005) (unpublished opinion), and the Kentucky Supreme Court case *Dunlap v. Com.*, 435 S.W.3d 537 (Ky. 2013), *as modified* (Feb. 20, 2014).

In *Elstad*, a law enforcement officer asked the defendant suspected of burglary two questions before Mirandizing him. First, the officer asked Elstad "'if he was aware of why [law enforcement was] there to talk.'" 470 U.S. at 301. And Elstad replied, "'[N]o.'" 470 U.S. at 301. Then, the officer asked Elstad if he knew the burglary victim without mentioning that this person had been burglarized. At this point, Elstad told the officer that he knew the victim and had heard there was "'a robbery'" at the victim's house. 470 U.S. at 301. Elstad then added that "'[he] was there.'" 470 U.S. at 301. Ultimately, the State of Oregon conceded that the officer's questioning of Elstad constituted custodial interrogation. The *Elstad* decision, however, included no analysis on the custodial interrogation issue. Even so, in deciding if Elstad's post-*Miranda* confession was voluntary, the United States Supreme Court assumed that the officer's pre-*Miranda* questioning of Elstad constituted a custodial interrogation. 470 U.S. at 315-16.

In *Cleaver*, a law enforcement officer drove Cleaver, who was suspected of murdering her infant child, from her workplace to her home. Once at Cleaver's home, and before Mirandizing Cleaver, a detective asked Cleaver: "'Do you know why we're here today?'" 2005 WL 2757478, at *2. Cleaver responded either "'because of my baby'" or "'because of what you found in my basement.'" 2005 WL 2757478, at *2. Before the trial court, Cleaver successfully moved to suppress her incriminating pre-*Miranda* statements as fruit of a custodial interrogation. The State of Wisconsin appealed this ruling. But the Wisconsin Court of Appeals affirmed the trial court, holding that the trial court ruling was supported by the record and by the law. 2005 WL 2757478, at *3.

Meanwhile, in *Dunlap*, when a law enforcement officer executing a search warrant arrived at Dunlap's home, the officer asked Dunlap: "'Do you know why we are here?'" 435 S.W.3d at 596. Dunlap, who was suspected of murder and had not been Mirandized, then responded "'[a]bout the Roaring Springs thing'"; the murders had occurred in Roaring Springs. 435 S.W.3d at 596. Upon Dunlap's appeal, the Kentucky Supreme

Court relied on *Elstad* and *Cleaver* to hold that Dunlap made his incriminating pre-*Miranda* statement while under custodial interrogation. 435 S.W.3d at 596.

*Sergeant Becker Interrogated Brown*

Now that we have reviewed the law on custodial interrogations, we will now consider the merits of Brown's underlying argument.

Once again, the trial court determined that although Brown was in custody when he made his incriminating pre-*Miranda* statements, Brown was not under interrogation when he made his incriminating pre-*Miranda* statements for the following reasons:  (1) because Sergeant Becker warned Brown twice about not saying anything more before Brown made his "spontaneous" incriminating pre-*Miranda* statements; (2) because Sergeant Becker asked Brown a "question or two" to ensure his safety as Brown's calmness indicated he may flee or fight; and (3) because none of Sergeant Becker's questions were related to Brown's alleged criminal conduct.

We first point out that at the *Jackson v. Denno* hearing the State neither played nor admitted Sergeant Becker's bodycam video of Brown's arrest into evidence. Instead, it relied on Sergeant Becker's testimony and a transcript of Brown's arrest created by the Haysville Police Department, which the trial court did not admit into evidence. At Brown's trial, the State played and admitted Sergeant Becker's bodycam video of Brown's arrest.

The preceding series of events are troubling for four reasons:  First, we do not have the transcript that Sergeant Becker relied on while testifying at the *Jackson v. Denno* hearing in the record on appeal. Second, although Sergeant Becker testified at both the *Jackson v. Denno* hearing and Brown's jury trial, by admitting Sergeant Becker's bodycam video into evidence at trial, the State admitted into evidence something that was

53

not before the trial court when it ruled that Brown's incriminating pre-*Miranda* statements were not the result of a custodial interrogation. Third, and perhaps most alarming, the trial court denied the admission of the transcript because it "duplicate[d] Sergeant Becker's testimony," meaning the transcript was cumulative. But the record on appeal indicates that the trial court never reviewed the transcript before ruling that it was cumulative of Sergeant Becker's testimony. Indeed, it seems that only Sergeant Becker and the State had copies of the transcript during the *Jackson v. Denno* hearing. Clearly, the trial court had no factual basis to support its ruling that the transcript was cumulative or duplicative of Sergeant Becker's testimony since it never reviewed the transcript. This, in and of itself, undermines the trial court's factual findings about Brown's incriminating pre-*Miranda* statements. Fourth, Sergeant Becker's bodycam video of Brown's arrest that the State admitted into evidence at Brown's trial wholly undermines each of the trial court's factual findings in support of its admissibility ruling.

For starters, although the trial court found that Sergeant Becker had warned Brown twice about not speaking to him before Brown made his incriminating pre-*Miranda* statements, this is incorrect. The video of Sergeant Becker's bodycam shows that Sergeant Becker first asked Brown:  "I'm assuming you know what this was about." Then, Brown responded, "Yes, sir." Afterwards, Sergeant Becker first warned Brown that he was not going to "discuss this" with him in front of his wife and that he could talk to a detective soon. Thus, Sergeant Becker did not provide his first warning until after he made his first potentially coercive communication.

After giving his first warning to Brown not to "discuss this," Sergeant Becker started talking to Brown once again. He asked Brown:  "I'm assuming you were kind of expecting us." Then, when Brown replied, "No," Sergeant Becker asked, "No." Then, after Sergeant Becker asked Brown "No," he told Brown "Okay" three times as Brown made a string of incriminating pre-*Miranda* statements. It was only after Brown made

54

this string of incriminating pre-*Miranda* statements that Sergeant Becker interrupted Brown mid-sentence in stating: "We're not going to be talking about it with me."

In short, despite providing the initial warning to Brown not to "discuss this," Sergeant Becker reengaged Brown by asking him: "I'm assuming you were kind of expecting us." Thus, it is readily apparent that substantial competent evidence does not support the trial court's finding that Brown made his incriminating pre-*Miranda* statements "after being told twice not to say anything more." Sergeant Becker's bodycam video definitively establishes that Sergeant Becker engaged in a discussion with Brown, then gave Brown a warning, reengaged a discussion with Brown, and then gave Brown another warning. Indeed, the timing of Sergeant Becker's second warning is noteworthy because Sergeant Becker allowed Brown to make a string of incriminating pre-*Miranda* statements before finally providing Brown with the second warning to not "talk[] about it with me." Simply put, if Sergeant Becker wanted to avoid eliciting incriminating pre-*Miranda* statements from Brown, he would have provided Brown with a second warning as soon as Brown indicated that he was not expecting them.

Sergeant Becker's bodycam video also disproves the trial court's finding that Sergeant Becker spoke to Brown to ensure only that Brown would not flee or fight. As already noted, a narrow exception allowing a law enforcement officer to ask a defendant limited questions related to public safety before Mirandizing that defendant exists. See *Johnson*, 46 Kan. App. 2d at 393-94 (discussing the public safety exception to *Miranda*). Nevertheless, as discussed in the fact section of our opinion, Officer Watkins had placed handcuffs on Brown as Sergeant Becker asked Brown: "I'm assuming you know what this is about." And Brown was already handcuffed when Sergeant Becker asked Brown, "I'm assuming you were kind of expecting us." Thus, even if Brown's calmness could have made Sergeant Becker reasonably believe that Brown might be a flee or fight risk, once Brown had been physically restrained, Sergeant Becker would no longer have any legitimate flee or fight concerns to support his questioning. As a result, no reasonable

55

person would have made the trial court's ruling that Sergeant Becker's discussion with Brown did not constitute custodial interrogation under the public safety exception to *Miranda*.

Next, we note that although the State now asserts that Sergeant Becker just made "statements" to Brown, this is not what the State argued before the trial court. Before the trial court, the State repeatedly referred to Sergeant Becker as questioning Brown. For instance, at one point, the prosecutor described Sergeant Becker as "ask[ing] questions, very general questions that are considered general, honest questioning by police officers." Undoubtedly, the prosecutor believed that Sergeant Becker had questioned Brown because this was Sergeant Becker's explicit testimony. Sergeant Becker testified that his "intention for the questions was more to gauge whether or not there was a potential flight risk or potential combat or something like that."

Also, in ruling that Brown's incriminating pre-*Miranda* statements to Sergeant Becker were admissible, the trial court found that Sergeant Becker was asking Brown questions. It specifically found that Sergeant Becker "asked the question or two" to ensure that Brown did not flee or fight. And it further found that Sergeant Becker's and Brown's discussion was "a situation in which *no interrogation* [*was*] *going on here other than a couple of questions about do you know why we're here*." (Emphasis added.)

The preceding finding by the trial court is critical for two reasons: First, it establishes that regardless of what the State now argues on appeal, the trial court believed that Sergeant Becker questioned Brown. Second, by finding that "no interrogation [was] going on here other than a couple of questions about do know why we're here," the trial court found that Brown was being interrogated when Sergeant Becker asked him questions. Again, the State has never disputed that Brown was in custody when he made his incriminating pre-*Miranda* statements to Sergeant Becker. Also, there can be no doubt that Brown was in custody when Sergeant Becker asked him: "I'm assuming you know

what this was about" and "I'm assuming you were kind of expecting us" as Sergeant Becker arrested Brown and told him that he was "taking him into custody."

Additionally, Sergeant Becker's syntax and intonation when talking to Brown establishes that he was indirectly questioning Brown. Outside of the two warnings Sergeant Becker gave to Brown about not "discuss[ing] this" with him, during the disputed exchange, Sergeant Becker asked Brown the following:  (1) "I'm assuming you know what this is about"; (2) "I'm assuming you were kind of expecting us"; and (3) "No." As mentioned earlier, he also told Brown "Okay" three times before giving Brown a second warning not to "talk[] to [him] about it."

A person's intonation may turn a declarative statement into the functional equivalent of a question, which is commonly called an indirect question. As explained by Janet E. Ainsworth in *In A Different Register: The Pragmatics of Powerlessness in Police Interrogation*, 103 Yale L.J. 259, 282 (1993), a law journal article discussing common female gender-linked syntactic and paralinguistic characteristics, a rising intonation changes an otherwise declarative statement into a question:

> "Ordinarily, English speakers use rising intonation to signal a question or for some other special effect. This is especially true for questions that are syntactically identical to declarative statements. For example, each of the following pairs of utterances typically would be distinguished in speech by the use of a high, rising intonation at the end of the second sentence in each pair.
>
> > "Chris isn't hère.
> > "Chris isn't hére? (expressing uncertainty and request for confirmation or explanation)
> > "I need a lawyèr.
> > "I need a lawyér? (expressing incredulity)"

57

In this case, although Sergeant Becker's disputed exchange with Brown may be read as declarative statements, Sergeant Becker's intonation is key. As shown on his bodycam video, the inflection in Sergeant Becker's voice while telling Brown "I'm assuming you know what this is about" and "I'm assuming you were kind of expecting us" established that Sergeant Becker was asking indirect questions. Sergeant Becker wanted Brown to confirm or explain if he knew why he was being arrested and expected to be arrested. As for Sergeant Becker's use of the word "assume," the word "assume" as used by Sergeant Becker means "to take for granted or suppose (something) to be true." Webster's New World College Dictionary 87 (5th ed. 2014). Thus, not only did Sergeant Becker's intonation signal that he was asking Brown an indirect question, by using the word "assume" Sergeant Becker told Brown that he would also take as true that "[he] kn[e]w what this was about" and that "[he was] kind of expecting [law enforcement]" unless he told him otherwise.

Turning to Sergeant Becker telling Brown "No," we note that Sergeant Becker told Brown "No" in response to Brown's statement indicating that he was not expecting "[law enforcement]." And this statement by Brown was in response to Sergeant Becker's indirect question: "I'm assuming you were kind of expecting us." Sergeant Becker's intonation when telling Brown "No" expressed uncertainty because he had just indicated to Brown that "I'm assuming you were kind of expecting us." In short, the uncertainty in Sergeant Becker's voice invited Brown to explain why he was not expecting law enforcement because Sergeant Becker initially assumed that Brown knew why law enforcement was at his house arresting him.

As for Sergeant Becker telling Brown "Okay" three times as Brown made a series of incriminating pre-*Miranda* statements, Sergeant Becker did not use a rising intonation while saying "Okay." Thus, Sergeant Becker made declarative statements when he said "Okay" to Brown.

58

Still, by saying "Okay," Sergeant Becker encouraged Brown to keep telling him why he was not expecting law enforcement. "Verbal fillers" or "filled pauses" are awkward hesitations and repeated words or phrases that people use while speaking. "Verbal fillers can be seen as signposts for people engaged in the complex give and take of conversation." See Gotthelf, *The Lawyer's Guide to Um*, 11 Legal Comm. & Rhetoric: JALWD 1, 11 (2014). Here, a review of Sergeant Becker's bodycam video establishes that he said "Okay" to Brown as a signpost that he was listening to what Brown had to say in response to his indirect questions: "I'm assuming you were kind of expecting us" and "No." Saying "Okay" was also a signal to Brown that he should keep explaining himself.

In a nutshell, Sergeant Becker's bodycam video establishes that when he asked, "I'm assuming you know what this is about," "I'm assuming you were kind of expecting us," and "No," Sergeant Becker was not making a declarative statement. Instead, his intonation established that he was asking Brown indirect questions. As a result, in addition to Sergeant Becker's explicit testimony that he questioned Brown, Sergeant Becker's syntax and intonation establishes that Sergeant Becker questioned Brown when he asked, "I'm assuming you know what this is about," "I'm assuming you were kind of expecting us," and "No." In turn, the State's contention that Sergeant Becker was not interrogating Brown because he simply made declarative statements as opposed to explicit questioning flies in the face of reason as well.

The State's remaining argument that Sergeant Becker's "statements" were not "necessarily likely to elicit an incriminating response" is also unconvincing. For starters, by asserting that Sergeant Becker's "statements" were not "necessarily likely to elicit an incriminating response," the State implicitly concedes that Sergeant Becker's questioning may have elicited an incriminating response. More importantly, under the facts of this case, it is readily apparent that Sergeant Becker should have known that his indirect

59

questioning of Brown would have been perceived by Brown as an invitation to divulge incriminating information.

When Sergeant Becker indirectly asked Brown, "I'm assuming you know what this is about," Sergeant Becker invited Brown to divulge details of his alleged criminal conduct. Clearly, if Brown responded "yes" to his indirect question, Brown would connect himself to the criminal conduct for which he was being arrested. And this is exactly how Brown responded to Sergeant Becker's indirect question.

Also, when Sergeant Becker asked Brown this indirect question, he had already told Brown that he and Officer Watkins were there "to take [him] into custody" for "an incident that happened last night." Thus, Sergeant Becker had already indicated to Brown why he was being arrested. Because Brown was complying with Sergeant Becker's and Officer Watkins' commands while being arrested, there was no need to further communicate with Brown to see if he understood why he was being arrested. Indeed, by telling Brown he was under arrest for "an incident that happened last night" and then indirectly asking Brown, "I'm assuming you know what this is about," Sergeant Becker essentially asked Brown to explain to him why he was under arrest.

As for Sergeant Becker's indirect question, "I'm assuming you were kind of expecting us," in asking this indirect question, Sergeant Becker again invited Brown to divulge details of his alleged criminal conduct. Any response from Brown about why he was or was not expecting the police to arrest him could connect Brown to the criminal conduct for which he was arrested. Plainly, people who have not engaged in criminal conduct would be surprised by their sudden arrest. Thus, when Sergeant Becker indirectly asked Brown, "I'm assuming you were kind of expecting us," Sergeant Becker specifically invited Brown to divulge if he knew that he had engaged in some conduct warranting his arrest. Also, as with Sergeant Becker's first indirect question—"I'm assuming you know what this is about"—Sergeant Becker's second indirect question

60

about if Brown was "kind of expecting [law enforcement]" was unnecessary because Sergeant Becker had already explained to Brown that he was under arrest for "an incident that happened last night."

As for Sergeant Becker's indirect question "No," as addressed already, Sergeant Becker asked this indirect question after Brown responded, "Uh, no" to his second indirect question: "I'm assuming you were kind of expecting us." In effect, Sergeant Becker asked Brown to clarify why he was not expecting his arrest. And this is exactly what Brown did as he then told Sergeant Becker that "she didn't say anything," "she didn't say she was going to call the cops on me," "I told her I was sorry," "I really didn't do anything," and "I didn't take my clothes off or anything."

Additionally, the *Elstad*, *Cleaver*, and *Dunlap* decisions that Brown cites in his brief supports that Sergeant Becker should have known that his indirect questioning of Brown invited Brown to divulge details of his underlying criminal conduct. Although the *Elstad*, *Cleaver*, and *Dunlap* decisions are merely persuasive authority, Sergeant Becker's disputed indirect questions are all but identical to the law enforcement officers' explicit questioning at issue in those cases. Once again, in *Elstad*, the United States Supreme Court assumed as true that a law enforcement officer who directly asked the defendant "'if he was aware of why [law enforcement was] there to talk'" engaged in an interrogation. 470 U.S. at 301, 315-16. Similarly, in *Cleaver* and *Dunlap*, the Wisconsin Court of Appeals and the Kentucky Supreme Court, respectively, determined that a law enforcement officer directly asking a defendant if the defendant knew why law enforcement were "there" constituted interrogation. *Cleaver*, 2005 WL 2757478, at *2-3; *Dunlap*, 435 S.W.3d at 596.

Here, just like the law enforcement officers in *Elstad*, *Cleaver*, and *Dunlap*, Sergeant Becker asked a known suspect who was in custody but not Mirandized if he understood why the police were there arresting him. Simply put, even though the *Elstad*,

61

*Cleaver*, and *Dunlap* decisions are merely persuasive authority, the decisions are highly persuasive authority as other courts have determined that law enforcement officers' questioning of defendants about their knowledge as to why law enforcement officers were contacting them constituted an interrogation, thus violating their Fifth Amendment rights as explained under *Miranda*.

Thus, the trial court erred by admitting Brown's pre-*Miranda* statements into evidence because Sergeant Becker's indirect questioning of Brown while in custody constituted the functional equivalent of custodial interrogation.

### *Erroneous Admission Harmed Brown*

Because the trial court admitted Brown's incriminating pre-*Miranda* statements to Sergeant Becker's custodial interrogation into evidence at trial, we must now consider if the trial court's admission of those incriminating pre-*Miranda* statements was harmless under the constitutional harmless error test. Once again, this requires the party benefiting from the error to prove beyond a reasonable doubt that the error complained of did not affect the jury's verdict in light of the entire trial record. *Ward*, 292 Kan. 542, Syl. ¶ 6.

The State makes two arguments on appeal about why the errant admission of Brown's incriminating pre-*Miranda* statements at his jury trial were harmless beyond a reasonable doubt. In its first argument, the State asserts that any error from the admission of Brown's incriminating pre-*Miranda* statements was harmless because Brown's "more incriminating statements were spontaneous." Evidently, the State believes that only Sergeant Becker's indirect questions that "I'm assuming you know what this is about" and "I'm assuming you were kind of expecting us" constituted interrogation. Thus, according to the State, Brown's incriminating pre-*Miranda* statements that did not directly follow the preceding indirect questions should be considered admissible.

62

In contrast, this argument is not truly about harmlessness. It is instead another argument about the underlying admissibility of Brown's incriminating pre-*Miranda* statements to Sergeant Becker. As addressed earlier, however, Brown's incriminating pre-*Miranda* statements to Sergeant Becker were not spontaneous. Instead, his responses directly corresponded to Sergeant Becker's three indirect questions: "I'm assuming you know what this is about," "I'm assuming you were kind of expecting us," and "No." Although Brown said multiple incriminating statements after Sergeant Becker's indirect question "No," Sergeant Becker then encouraged Brown to continue to speak by saying "Okay" three times. Thus, the State's argument that Brown's "more incriminating pre-*Miranda* statements were spontaneous" is unconvincing.

The State's remaining harmlessness argument is that "the evidence, including that defendant was not so intoxicated that he could not form the requisite intent(s), was overwhelming as set forth repeatedly above." Nevertheless, the only somewhat extended discussion of harmlessness in the State's brief concerns if the trial court's denial of Brown's *Daubert* hearing and jury trial motion for continuance could be considered harmless. In making this argument, the State alleges that "[o]verwhelming evidence showed that defendant knew he went into M.K.'s house through her unlocked door, and it powerfully demonstrated defendant was capable of forming the requisite intents when doing so to sexually batter M.K." But outside of noting that Brown went into M.K.'s house through her unlocked door, the State cites no other evidence to support its contention that overwhelming evidence established Brown's ability to form the specific intent necessary to commit the aggravated burglary and aggravated sexual battery against M.K.

Simply put, the fact that Brown went into M.K.'s house does not constitute overwhelming evidence that he could form the specific intent necessary to commit the aggravated burglary and aggravated sexual battery of M.K. This fact is just one piece of circumstantial evidence that the jury may have considered when deliberating Brown's

63

intent. Also, the State's assertion is conclusory. The State cannot successfully claim that overwhelming evidence exists to support Brown's convictions without (1) explaining why the piece of evidence it cites is overwhelming or (2) otherwise citing to evidence that overwhelmingly establishes Brown's guilt.

It is a well-known rule that we will not consider points raised incidentally in a party's brief and not argued there. Instead, we will deem such points abandoned. *State v. Lowery*, 308 Kan. 1183, 1231, 427 P.3d 865 (2018). Here, by failing to explain what overwhelming evidence established that Brown had the specific intent necessary to commit the aggravated burglary and the aggravated sexual battery of M.K., the State has abandoned its assertion that any error from the admission of Brown's incriminating pre-*Miranda* statements into evidence at his jury trial was harmless. Because the State carries the burden of establishing harmlessness, the State's failure to properly brief this issue is fatal. See *Ward*, 292 Kan. 542, Syl. ¶ 6 (holding that the party benefiting from a constitutional error has the burden of establishing harmlessness).

Notwithstanding the preceding, the evidence supporting that Brown could form the specific intent necessary to commit an aggravated burglary and aggravated sexual battery was not overwhelming. Outside of Brown's incriminating pre-*Miranda* statements to Sergeant Becker, the most incriminating evidence concerning Brown's ability to form the specific intent necessary to commit the aggravated burglary and aggravated sexual battery of M.K. came from the two phone calls Brown placed to his wife while in jail immediately following his arrest. During those jail phone calls, Brown told his wife that he had not "do[ne] anything," that he "apologized to [M.K.]," and that M.K. had never said "she was going to call the cops."

Clearly, the preceding statements parallel some of the incriminating pre-*Miranda* statements that Brown made to Sergeant Becker during his custodial interrogation. Nonetheless, the jail phone calls do not contain any conversation similar to Brown's most

incriminating pre-*Miranda* statement:  "I didn't really do anything, you know. I didn't take my clothes off or anything." Brown's comment that he did not take his clothes off established that he could remember a very important detail of what happened when he was on top of M.K. while in M.K.'s bed. It further places his other incriminating pre-*Miranda* statements in the context of a sex crime against M.K. Also, it implies that Brown did not believe what he did to M.K. was inappropriate because he "didn't take his clothes off or anything."

The context of Brown's jail phone call comments about not having "do[ne] anything," having "apologized to [M.D.K]," and having never been told by M.K. that "she was going to call the cops," however, is very different. In the jail phone call, Brown seemed shocked to learn that he tried to take over the steering wheel when Conner drove him home from the bar. He seemed shocked to learn that he had driven his own car to the liquor store after Conner had driven him home and taken his car keys. And he seemed shocked to learn that he was charged with an aggravated sexual battery. Moreover, when his wife told Brown that she had learned from the bondsman that M.K. woke up to him lying on top of her, Brown responded, "Oh God. What else, what happened? I didn't do anything."

As a result, although some of Brown's incriminating pre-*Miranda* statements were like Brown's comments to his wife during the jail phone call, the context of Brown's comments to his wife during the jail phone call was substantially less incriminating. This is because in those phone calls, Brown alleged that he had no memory of being in M.K.'s bed. And he told his wife that he did not do anything because he had no memory of doing anything. This is very different than telling Sergeant Becker, who was arresting him for the aggravated sexual battery of M.K., that he "didn't really do anything" because he "didn't take [his] clothes off or anything."

65

Also, although Dr. Goodman was not allowed to testify as Brown's expert witness on the effects of his alcohol and drug consumption, Dr. Goodman's report on Brown's psychological evaluation states that Brown had very few discernable memories after he went to the bar where Conner, Conner's wife, and her friends were celebrating a birthday. Specifically, Brown provided Dr. Goodman the following narrative of his memory of what happened once he reached the bar:

"I then that evening drove down to the [bar] and had more mixed drinks. At that time my memory became clouded. I don't remember the ride home by my friend from the bar. My friend tried to take me home several times. I ended up urinating on myself. My friend got fed up with me. He lives right across the street from me. By that time[,] I can't remember any more details until I was in bed with a neighbor woman who noticed I was in bed with her. I am totally oblivious of how I ended up in bed with her. I remember bits and pieces of her talking to me. I don't even remember staggering back to my place across the street from her. She claims that I went back to her house three or four times and I remember none of this."

As a result, outside of his incriminating pre-*Miranda* statement to Sergeant Becker, he had not "really do[ne] anything" because he had not "take[n his] clothes off or anything," the record on appeal indicates that Brown had no memory of entering M.K.'s house and very few discernable memories of being inside M.K.'s house. Also, according to Dr. Goodman's report, Brown believed that he was merely in bed with M.K., as opposed to on top of M.K. telling her that he wanted to have sex. Clearly, the most significant piece of evidence indicating that Brown had some awareness of the unwanted sexual advances he made towards M.K. was his incriminating pre-*Miranda* statement to Sergeant Becker that he had not "really do[ne] anything" because he had not "take[n his] clothes off or anything."

Also, the State undoubtedly recognized this because in its closing arguments, the prosecutor highlighted this incriminating pre-*Miranda* statement, saying:

"If you are really blacked out, do you remember? He told the police I apologized to her. You saw the Axon video. All they did was walk up. *'I apologized to her.' 'I didn't take my clothes off.' Well, how do you know? If you don't remember, how do you know? 'She said she wouldn't call the police,' and then how would you know? If you don't remember what happened, how would you know?*" (Emphasis added.)

Shortly after stating the preceding, the prosecutor also equated Brown's memory of what happened inside M.K.'s house as evidence that Brown had the specific intent necessary to commit an aggravated burglary and aggravated sexual battery against M.K. The prosecutor stated that because Brown "was conscious, he had a conscious objective."

The prosecutor's emphasis during closing arguments on Brown's memory of not removing his clothes is significant for a couple of reasons: First, it establishes that even assuming the State has not abandoned its argument that the admission of Brown's incriminating pre-*Miranda* statements were harmless beyond a reasonable doubt, it is readily apparent that the admission of Brown's incriminating pre-*Miranda* statements was not harmless beyond a reasonable doubt. The State sought to bolster its case against Brown by relying on Brown's incriminating pre-*Miranda* statements to argue that Brown's memory of what happened during his altercation with M.K. established that Brown was not so intoxicated that he could not form the specific intent to commit the aggravated burglary and aggravated sexual battery against M.K. This necessarily prejudiced Brown's voluntary intoxication defense.

Second, it emphasizes the prosecutor's fundamental misunderstanding of Brown's voluntary intoxication defense. K.S.A. 2016 Supp. 21-5205(b)—the statutory provision on voluntary intoxication—states:

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary

67

element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

Here, Brown was charged with aggravated burglary under K.S.A. 2016 Supp. 21-5807(b) and aggravated sexual battery under K.S.A. 2016 Supp. 21-5505(b)(2). K.S.A. 2016 Supp. 21-5807(b)(1) states: "Aggravated burglary is, without authority, entering into or remaining within any . . . [d]welling in which there is a human being, with intent to commit a felony, theft or sexually motivated crime therein." On the other hand, K.S.A. 2016 Supp. 21-5505(b)(2) states: "Aggravated sexual battery is the touching of a victim who is 16 or more years of age and who does not consent thereto with the intent to arouse or satisfy the sexual desires of the offender or another . . . when the victim is unconscious or physically powerless." Also, sexual battery under K.S.A. 2016 Supp. 21-5505(a), which the trial court instructed the jury upon as a lesser included offense of aggravated sexual battery, requires the defendant to have acted "with the intent to arouse or satisfy the sexual desires of the offender or another."

Thus, Brown's voluntary intoxication defense hinged on establishing that his voluntary intoxication prevented him from acting "with the intent to arouse or satisfy the sexual desires of the offender or another." K.S.A. 2016 Supp. 21-5202(h) defines the culpable mental state "intentionally" or "with intent" as meaning "it is such person's conscious objective or desire to engage in the conduct or cause the result." So as applied to Brown's criminal charges, the State needed to prove that Brown had the "conscious objective or desire" to arouse or satisfy the sexual desires of himself or M.K.

Although Brown's memory of being inside M.K.'s house may constitute evidence that Brown could form the specific intent necessary to arouse the sexual desires of himself or M.K., contrary to the State's closing argument, his memories of what happened does not necessarily mean that he had a conscious objective or desire to arouse or satisfy the sexual desires of himself or M.K. While the word "conscious" is often a synonym for

68

being "awake," Merriam Webster's Dictionary also defines "conscious" as "having mental faculties not dulled by sleep, faintness, or stupor." Merriam-Webster.com, https://merriam-webster.com/dictionary/conscious (online ed. 2021). Both the plain language of K.S.A. 2016 Supp. 21-5202(h), as well as the preceding definition, support that a person must take more affirmative steps to intentionally commit a crime than just being awake. Thus, the words "conscious objective or desire" as used when defining the term "intentionally" and "with intent" as a culpable mental state implies that a person must be both aware of his or her actions and wants to engage in his or her actions.

As a result, although the State alleged that Brown's memory made him conscious, and his consciousness meant he had a conscious objective, this is not the case. A person's memory of a disputed action does not necessarily mean that a person intended a disputed action.

Indeed, the fact that Webster's Dictionary defines "conscious" as "having mental faculties not dulled by sleep, faintness, or *stupor*" is telling. (Emphasis added.) As noted previously, Dr. Goodman specifically opined that Brown was in "a stupor stage of alcohol influence" during the early morning hours of November 27, 2016. Further, Brown's friends testified that Brown was acting abnormally. Conner explicitly testified that when he escorted Brown out of his house between 1:30 a.m. and 2 a.m. on November 26, 2016, he looked into Brown's eyes and could tell that "nobody was home" and that Brown "was on auto pilot."

Simply put, Brown's statements regarding his lack of memory during his jail phone call, Dr. Goodman's report, and Brown's friends' testimony strongly indicated that during the early morning hours of November 27, 2016, Brown was so intoxicated that he fell into a state of stupor. In turn, this evidence supported Brown's defense that he was so intoxicated that he could not form a conscious objective or desire to arouse or satisfy his own sexual desires or the sexual desires of M.K. As a result, despite the State's arguments

69

to the contrary, there was not overwhelming evidence that Brown acted with the requisite specific intent to commit an aggravated burglary and aggravated sexual battery against M.K.

To conclude, the strongest evidence that Brown purposefully made unwanted sexual advances to M.K. was his incriminating pre-*Miranda* statements resulting from Sergeant Becker's impermissible custodial interrogation. Because the admission of Brown's incriminating pre-*Miranda* statements resulting from Sergeant Becker's impermissible custodial interrogation was not harmless beyond a reasonable doubt, we reverse Brown's aggravated burglary and aggravated sexual battery convictions and remand for a new trial where those statements are excluded from the evidence.

*Does the Trial Court's Denial of Brown's Motion for Continuance Require Reversal of Brown's Convictions?*

On appeal, Brown argues that the trial court committed reversible error by denying his *Daubert* hearing and jury trial motion for continuance. In making his argument, Brown argues that our decision in *State v. Huntley*, 39 Kan. App. 2d 180, 177 P.3d 1001 (2008), establishes the trial court could not deny his motion for continuance based on admissibility concerns regarding Dr. Goodman's proposed expert testimony. Brown further argues that the trial court failed to adequately consider the importance of Dr. Goodman's proposed expert witness testimony in presenting his voluntary intoxication defense. Also, Brown asserts that in denying his motion, the trial court ignored that Dr. Goodman would be available to testify at a *Daubert* hearing or jury trial in the near future. He then concludes that the trial court's denial of his *Daubert* hearing and jury trial motion for continuance undermined his voluntary intoxication defense, which in turn requires reversal of his aggravated burglary and aggravated sexual battery convictions.

70

As it did below, the State argues that the trial court properly denied Brown's *Daubert* hearing and jury trial motion for continuance because Brown had already received multiple continuances and because caselaw supports that intoxication is a subject readily understood by the jury. It further argues that the trial court properly denied Brown's motion because Dr. Goodman's opinion only concerned Brown's involuntary intoxication defense.

*Continuances Law*

K.S.A. 22-3401 provides that "[c]ontinuances may be granted to either party for good cause shown." In *State v. Howard*, 221 Kan. 51, 55, 557 P.2d 1280 (1976), our Supreme Court explained that a trial court "must weigh" the following four factors when considering whether to grant or deny a defendant's motion for continuance to ensure the availability of a witness:  (1) "the probability of the witness' appearance at a later date if the continuance is granted"; (2) "the diligence (or lack of it) disclosed in attempting to secure the attendance of the witness"; (3) the "possible prejudice to the defendant"; and (4) "the materiality and importance of the probable testimony." Consideration of the preceding four *Howard* factors is necessary to ensure the defendant's federal and Kansas constitutional right to present his or her theory of defense is preserved. *Huntley*, 39 Kan. App. 2d at 186; see also *Pennington*, 281 Kan. at 439 (explaining that "[u]nder our state and federal Constitutions, a criminal defendant has the right to present his or her defense theory").

When reviewing the trial court's denial of a defendant's motion for continuance, "[a]n appellate court will not disturb the trial court's ruling unless the defendant can show that the trial court abused its discretion and prejudiced his or her substantial rights." *State v. Ly*, 277 Kan. 386, 389, 85 P.3d 1200 (2004). An abuse of discretion occurs when the trial court's "ruling was arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would take the view adopted by the trial court." *State v. Haney*, 299 Kan. 256, 259, 323

71

P.3d 164 (2014). An abuse of discretion may also occur when the trial court's "ruling is based on an error of law, *i.e.*, the discretion is guided by an erroneous legal conclusion, or where the ruling is based on an error of fact, *i.e.*, substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." 299 Kan. at 259-60. Also, "[a]n abuse of discretion may be found if the district court's decision goes outside applicable legal standards." *Huntley*, 39 Kan. App. 2d at 186 (citing *State v. Edgar*, 281 Kan. 30, 38, 127 P.3d 986 [2006]).

In *Huntley*, we reversed a defendant's rape and aggravated criminal sodomy convictions because the trial court went outside the applicable legal standards for ruling on Huntley's motion for continuance when denying it. There, Huntley moved to continue his jury trial so he could retain an expert witness who could review the questioning, statements, and mannerisms of his victims, who were all children, in their videotaped forensic interviews. But the trial judge ultimately denied Huntley's motion for continuance. The trial court first explained that it was denying Huntley's motion because he was not sure whether such a witness' testimony would be admissible expert testimony:

> "[P]robably the most important is I'm not sure even if you and the State of Kansas paid for the money to hire whomever you were going to hire to look at these tapes, that this Court was going to allow that testimony to come in. I think that you can, by cross-examination, question the people as to can kids be led, and are they subject to that? I think jurors normally know those things just because they've had kids and therapy kids. And so, some of those things are not expert testimony type issues, they are common sense." 39 Kan. App. 2d at 182.

The trial judge then explained that it was denying Huntley's motion for continuance because "even though [the defense attorney] had suggested to [him that the defense] might be available to go back to trial next month, this Court couldn't put [the defense] on a jury trial docket until March at the next time." 39 Kan. App. 2d at 182.

After a jury convicted Huntley of multiple counts of rape and aggravated criminal sodomy, Huntley appealed the trial court's denial of his motion for continuance to us. Huntley asserted that the trial court relied on impermissible grounds to deny his motion for continuance. In the end, we agreed with Huntley and reversed his convictions because it determined that the trial court abused its discretion in three ways when denying his motion for continuance. 39 Kan. App. 2d at 189-90.

First, because caselaw indicated that expert witness testimony regarding child interviewing techniques constituted an issue outside the knowledge of the jury, we held "that the court was guided by the erroneous legal conclusion that any such testimony from an expert in these areas would not be admissible." 39 Kan. App. 2d at 189. Second, we "agree[d] with Huntley's contention that the determination of inadmissibility was . . . premature" because "[t]he expert had not yet been secured, and the scope of his or her testimony could not yet be established." 39 Kan. App. 2d at 188. Third, we held that the trial court's rescheduling concerns constituted an inappropriate weighing of the *Howard* factors. 39 Kan. App. 2d at 190. In reaching this third holding, we noted that the trial court never considered Huntley's diligence in attempting to secure the expert witness as required under the *Howard* factors, and the record otherwise indicated that Huntley was diligent in attempting to secure the expert witness. 39 Kan. App. 2d at 190. Also, we noted that the trial court never considered the probability that Huntley would be able to have the expert witness testify at a later trial. 39 Kan. App. 2d at 190. It then explained "[w]eighing these factors against the potential importance of the witness and the possible prejudice to the defense, we fail to understand the court's concern over rescheduling." 39 Kan. App. 2d at 190.

Thus, the *Huntley* decision stands for the proposition that a trial court must stay within the confines of the *Howard* factors when deciding whether to grant or deny a defendant's motion for continuance to ensure an expert witness' availability to testify at

trial. If a trial court considers an issue outside of the four *Howard* factors, the trial court commits an error of law. See 39 Kan. App. 2d at 190.

Finally, we note that K.S.A. 2017 Supp. 60-456(b) controls the admission of expert witness testimony. It states:

> "If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

*Continuance Wrongly Denied*

Now that we have reviewed the applicable law concerning motions for continuances, we now consider whether the trial court properly denied Brown's *Daubert* hearing and jury trial motion for continuance under the *Howard* factors.

To begin this discussion, we first note that the trial court never cited any authority, including the *Howard* factors, when it denied Brown's *Daubert* hearing and jury trial motion for continuance. Also, although some of the trial court's findings may fit under the *Howard* factors, it is readily apparent that the trial court was not considering the *Howard* factors when it denied Brown's motion for continuance. Nevertheless, our Supreme Court has determined that "the trial judge *must weigh*" the *Howard* factors when considering a defendant's motion for continuance to secure a witness. (Emphasis added.) 221 Kan. at 55.

Also, even if we interpreted some of the trial court's findings as fitting under the *Howard* factors, the trial court made no finding that can fit under the *Howard* factor

74

regarding the likelihood that Dr. Goodman could testify at a later date should it grant the continuance. And as the State concedes in its brief, this *Howard* factor weighed in favor of granting Brown's motion for continuance because at the continuance hearing, Falk, Brown's attorney, explained that Dr. Goodman could testify for a *Daubert* hearing or a jury trial within a couple of weeks.

Thus, from the outset, it is readily apparent that the trial court violated our Supreme Court precedent in *Howard* when it denied Brown's motion for continuance. As a result, the trial court's failure to follow *Howard*, including its failure to consider the *Howard* factor regarding Dr. Goodman's future availability to testify, constituted an error of law.

Although the trial court did not strictly comply with *Howard*, most of its findings fit loosely under the *Howard* diligence factor. In denying Brown's *Daubert* hearing and jury trial motion for continuance, the trial court correctly noted that Brown's criminal case had been pending for 16 months, that Brown had previously received 5 continuances, and that Brown's ability to argue voluntary intoxication was not a late-breaking event. Arguably, one could interpret the preceding fact-findings as evidence that Brown did not diligently secure Dr. Goodman's attendance at his trial despite having ample time to do so.

Nevertheless, the trial court also made conflicting findings regarding Brown's diligence in securing Dr. Goodman's trial attendance. As Brown notes, the trial court found that it was Dr. Goodman who "said that he was available and then changed his representation" both at the continuance hearing and *Van Cleave* hearing. Thus, although the trial court never explicitly said so, in effect, it found that it was not for Brown's lack of diligence that Dr. Goodman became unavailable. Additionally, some evidence supports this finding. For example, although Falk admitted that he never subpoenaed Dr. Goodman, he also explained that he had previously used Dr. Goodman as an expert

75

witness several times. According to Falk, he never had a problem with Dr. Goodman testifying as an expert witness in the past. Also, Falk explained that based on his discussions with Dr. Goodman he believed that Dr. Goodman would be available to testify any time after Wednesday morning the week of Brown's scheduled jury trial.

In short, although Falk could have taken more steps to ensure Dr. Goodman's trial availability, he was not completely negligent in his efforts to secure Dr. Goodman's appearance at Brown's trial. That is, as discussed in the preceding paragraph, Falk made several affirmative steps to ensure Dr. Goodman's trial availability. Thus, substantial competent evidence supports the trial court's fact-finding that it was Dr. Goodman who indicated he would be available to testify and then changed his mind. As a result, under the facts of this case, where Brown's case had been pending for 16 months and where Brown had already received 5 continuances but where Brown's attorney had been relatively diligent in securing Dr. Goodman's trial attendance, the trial court should not have weighed this *Howard* factor for or against Brown. In effect, Falk's relative diligence in securing Dr. Goodman's trial attendance offset the fact that Brown's case had been pending for 16 months and that he had already received 5 continuances.

Next, it is readily apparent that to the extent the trial court considered the *Howard* factors concerning prejudice to the defense and the materiality and importance of the unavailable witness' probable trial testimony, the trial court wrongly weighed those factors against Brown.

In denying Brown's *Daubert* hearing and jury trial motion for continuance, the only findings the trial court made concerning prejudice to Brown's defense and the materiality and importance of Dr. Goodman's probable trial testimony concerned the trial court's comments on "intoxication evidence" being presented to juries "without experts all the time." Once again, in denying Brown's motion for continuance, the trial court initially recognized that it should not consider the admissibility of Dr. Goodman's

76

proposed expert testimony without first holding a *Daubert* hearing. Immediately after saying this, however, the trial court explained that it was also denying Brown's motion for the following reasons: (1) because "i[t] is apparent intoxication is something that juries understand"; (2) because "intoxication evidence [is] presented without experts all the time"; and (3) because in cases where defendants raise voluntary intoxication, a lack of expert testimony does not "inhibit or limit the defendant's defense."

Thus, while the trial court initially recognized that it should not consider the admissibility of Dr. Goodman's proposed expert testimony without holding a *Daubert* hearing, it then immediately made findings about the admissibility of Dr. Goodman's proposed expert testimony. In other words, the trial court found that the exclusion of Dr. Goodman's proposed expert testimony would "not in any way inhibit or limit [Brown's] defense of voluntary intoxication" because "[i]t is apparent intoxication is something that juries understand" and because "intoxication evidence [is] presented without experts all the time."

Plainly, the trial court's denial of Brown's *Daubert* hearing and jury trial motion for continuance on the basis that Dr. Goodman's testimony was inadmissible is problematic. As stated earlier, when determining whether to grant or deny a defendant's motion for continuance to secure the attendance of a witness at trial, courts must weigh the *Howard* factors. 221 Kan. at 55. When determining whether a witness' proposed testimony constitutes admissible expert opinion testimony under K.S.A. 2017 Supp. 60-456(b), however, courts look to the *Daubert* factors. *State v. Lyman*, 311 Kan. 1, 22, 455 P.3d 393 (2020). Although one *Howard* factor requires courts to consider the materiality of the proposed witness' testimony, the *Daubert* factors involve a deeper analysis of a party's proposed expert witness' testimony. Specifically, the *Daubert* factors are as follows:

77

"(1) whether the theory or technique can be (and has been) tested; (2) whether it has been subject to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique has general acceptance within a relevant scientific community." 311 Kan. at 22.

Thus, in considering a defendant's motion for continuance to secure a witness' attendance, the trial court must consider the materiality and importance of that witness' probable testimony as alleged by the defendant. Consideration of whether a party's proposed expert witness' testimony passes the *Daubert* test is an entirely different inquiry. More importantly, it is an inquiry that should not take place on a motion for continuance governed by the weighing of the *Howard* factors. Simply put, absent authority establishing that the defendant's proposed expert witness' testimony is per se inadmissible under K.S.A. 2017 Supp. 60-456(b), when a defendant seeks to continue a *Daubert* hearing to ensure his or her proposed expert witness' availability at that *Daubert* hearing, the trial court should not consider arguments that the defendant's proposed expert witness' testimony would be inadmissible under *Daubert*. Logically, if a defendant's proposed expert witness is not allowed to testify at a *Daubert* hearing, then that proposed expert witness cannot testify about the theory, techniques, and other relevant information relied upon in forming his or her proposed expert opinion. In turn, the trial court deciding the admissibility of the proposed expert's opinion without that proposed expert's testimony lacks critical information necessary to understand if that proposed expert's opinion falls within the common knowledge and understanding of the jury or involves specialized knowledge. As a result, consideration of *Daubert* admissibility arguments at a hearing governed by the *Howard* factors places a defendant seeking to continue a *Daubert* hearing to ensure his or her proposed expert witness' attendance at that *Daubert* hearing at a significant disadvantage. The *Howard*-factor test and the *Daubert*-factor test are distinct tests that cannot be merged without considerable prejudice to the defendant.

So, here, unless some authority proves that Dr. Goodman's proposed expert testimony was per se inadmissible under K.S.A. 2017 Supp. 60-456(b), the trial court erred as a matter of law by finding Dr. Goodman's proposed expert testimony inadmissible without first holding a *Daubert* hearing.

Here, the trial court seemingly ruled that Dr. Goodman's proposed expert testimony was per se inadmissible under K.S.A. 2017 Supp. 60-456(b) because such testimony would "not in any way inhibit or limit [Brown's] defense of voluntary intoxication" since "[i]t is apparent intoxication is something that juries understand." Nevertheless, the trial court's conclusions are not supported by the law.

For starters, although the trial court noted that "intoxication evidence [is] presented without experts all the time," in many cases where defendants argue voluntary intoxication as a defense, defendants retain an expert witness to testify in support of their defense at trial. See, e.g., *Kansas v. Cheever*, 571 U.S. 87, 90-91, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013); *Pratt*, 255 Kan. at 769; *State v. DeMoss*, 244 Kan. 387, 392, 770 P.2d 441 (1989); see also *State v. Sasser*, 305 Kan. 1231, 1247-48, 391 P.3d 698 (2017) (Biles, J., concurring) (explaining that intoxication related evidence may come in the form of lay or expert opinion testimony).

Next, Kansas caselaw establishes that our inquiry must focus on whether the defendant's proposed expert witness testimony concerned general or specific opinions about the effect of alcohol and drugs on a person's behavior. For instance, in *State v. Chavez-Aguilar*, No. 103,878, 2011 WL 6382742, at *6 (Kan. App. 2011) (unpublished opinion), we determined that the trial court did not err by excluding a forensic psychologist's proposed expert witness testimony on behalf of Chavez-Aguilar's voluntary intoxication defense when that forensic psychologist was only going to testify about how "cocaine and alcohol, taken individually and in tandem, can disrupt a person's thought processes." We explained that the exclusion of such testimony was proper

because this type of information was within the common knowledge of the average juror. 2011 WL 6382742, at *6.

In *Merrills v. State*, No. 102,021, 2010 WL 5139879, at *1, 10 (Kan. App. 2010) (unpublished opinion), on the other hand, we ruled that Merrills' trial attorney provided ineffective assistance of counsel when he failed to retain an expert witness to determine whether the victim's drug use affected his perception when Merrills shot him; the victim's perception was significant because Merrills alleged that he shot the victim in self-defense. We ultimately ruled that Merrills' attorney was ineffective because "whether the interaction of drugs in [the victim's] system and in his drug regimen influenced [the victim's] behavior at the time of the shooting is unlikely to be a matter within the common knowledge of a jury." 2010 WL 5139879, at *10. We then added that

> "it [was] likely that expert testimony with regard to whether the effect and interaction of drugs in [the victim's] system and in his drug regimen influenced [the victim's] behavior at the time of the shooting would have assisted the jury in assessing credibility of the victim, who was the key witness in the State's case against Merrills." 2010 WL 5139879, at *10.

Our emphasis on whether the defendant's proposed expert witness testimony concerned general or specific opinions about the effect of alcohol and drugs on a person's behavior is also consistent with our rules regarding the admission of expert opinions on medical issues. Although "a lay witness may testify about the external appearances and manifest medical conditions that are readily apparent to anyone," "lay witnesses are not competent to provide reliable testimony about medical matters . . . that are not readily apparent such as medical diagnosis or the effects of possible medical conditions." *State v. McFadden*, 34 Kan. App. 2d 473, 478, 122 P.3d 384 (2005). Accordingly, Kansas caselaw indicates that general testimony about the effects of alcohol and drugs on a person is impermissible through expert witness testimony. Specific testimony about how a person's alcohol or drug consumption may have affected that person's behavior,

however, may be admissible if such testimony is reliable and relevant under K.S.A. 2017 Supp. 60-456(b) and the *Daubert* factors.

As indicated already, Dr. Goodman's psychological evaluation of Brown included Brown recounting what he remembered drinking, consuming, and doing on November 26, 2016, and the early morning hours of November 27, 2016. Brown also told Dr. Goodman about many events he could not remember. Based on the preceding information, Dr. Goodman opined that Brown's alcohol and marijuana consumption between November 26, 2016, and the early morning hours of November 27, 2016, placed him in "a stupor stage of alcohol influence."

Thus, our review of caselaw and Dr. Goodman's proffered report establishes two things: First, Dr. Goodman's opinion was not general testimony about intoxication. It specifically concerned how Brown's alcohol and drug consumption may have affected his behavior when he entered M.K.'s house, crawled on top of M.K., and repeatedly told M.K. that he wanted to have sex with her. So the trial court erred as a matter of law by ruling that Dr. Goodman's proposed expert testimony was per se inadmissible without first holding a *Daubert* hearing. Second and relatedly, this also means that to the extent the trial court considered the *Howard* factors concerning prejudice to the defense and the materiality and importance of the unavailable witness' probable trial testimony when denying Brown's motion for continuance, its sole finding in support of weighing those *Howard* factors against Brown hinged on an error of law. This, in turn, makes the trial court's decision in this case very similar to the trial court's decision in *Huntley*. As in *Huntley*, the trial court here prematurely denied the defendant's motion for continuance because it wrongly ruled that the defendant's proposed expert witness' testimony fell within the common knowledge and experience of the jury. 39 Kan. App. 2d at 188-89.

Turning to the State's counterarguments, for reasons previously explained, we reject the State's contentions that the trial court properly denied Brown's motion (1)

because he had received multiple continuances already and (2) because Dr. Goodman's testimony fell within the common knowledge and experience of the jury. As for the State's remaining argument, the State's contention that the trial court properly denied Brown's *Daubert* hearing and jury trial motion for continuance because Dr. Goodman's proposed expert testimony concerned only Brown's possible involuntary intoxication defense is disingenuous. In its brief, the State repeatedly asserts that Dr. Goodman's proposed expert testimony concerned only whether Brown's alcoholism supported an involuntary intoxication defense. The State then argues that the trial court properly denied Brown's *Daubert* hearing and jury trial motion for continuance because alcoholism cannot form the basis of an involuntary intoxication defense. See *State v. Palacio*, 221 Kan. 394, Syl. ¶ 1, 559 P.2d 804 (1977) (holding that a person must be tricked or coerced into intoxication to support an involuntary intoxication defense).

It is true that even though our Supreme Court precedent prohibits such a defense, Falk wanted to raise an involuntary intoxication defense on Brown's behalf based on Brown's alcoholism. Thus, Falk asked Dr. Goodman to provide him an opinion as to whether Brown's alcoholism prevented him from forming the specific intent necessary to commit the aggravated burglary and aggravated sexual battery against M.K. But he also asked Dr. Goodman to provide an opinion on if Brown's voluntary alcohol and drug consumption prevented him from forming the specific intent necessary to commit those crimes.

Although Dr. Goodman specifically mentioned "involuntary intoxication" in his report, he also discussed the effects of Brown's voluntary intoxication on Brown's behavior: "It is this examiner's opinion that Mr. Brown was most likely at a level that would cause a stupor stage of alcohol influence." When Brown moved for a *Daubert* hearing and jury trial continuance based on Dr. Goodman's unavailability, he explicitly asserted that "Dr. Goodman's findings are critical to the defense of this case, as it [was his] intention to put on a[n] 'involuntary' and or 'voluntary intoxication' defense." And at

that same hearing, the prosecutor clearly recognized that Brown sought to have Dr. Goodman testify as an expert on behalf of his voluntary intoxication defense because she stressed that Brown could present his voluntary intoxication defense without Dr. Goodman's "junk science." Quite simply, the State's appellate argument that Brown never sought Dr. Goodman's expert opinion to support his voluntary intoxication defense is misleading and entirely unsupported.

Of additional note, in making the preceding argument, the State further challenges the reliability and qualifications of Dr. Goodman. As discussed already, however, absent authority establishing that the defendant's proposed expert witness' testimony is per se inadmissible under K.S.A. 2017 Supp. 60-456(b), when a defendant seeks to continue a *Daubert* hearing to ensure his or her proposed expert witness' availability at that *Daubert* hearing, the trial court should not consider arguments that the defendant's proposed expert witness' testimony would be inadmissible under *Daubert*. Instead, the key consideration about the proposed expert witness' testimony at a continuance hearing governed by the *Howard* factors should be the possible prejudice to the defendant if the continuance is denied and the materiality and importance of the witness' probable testimony. 221 Kan. at 55. In short, any arguments the State made below concerning the reliability and qualifications of Dr. Goodman under *Daubert* were not properly before the trial court when it denied Brown's *Daubert* hearing and jury trial motion for continuance. Thus, the State's current appellate arguments about the reliability and qualifications of Dr. Goodman are not properly before us.

Notwithstanding the preceding, Dr. Goodman's report establishes that his potential expert witness' testimony was highly material and important to Brown's voluntary intoxication defense. Again, Dr. Goodman opined that Brown's alcohol consumption caused Brown to enter "a stupor stage of alcohol influence." Persons in the stupor stage of alcohol influence usually have a blood alcohol content between .27 and .40 and may

83

suffer impaired consciousness. The stage of alcohol influence immediately following stupor is coma and then death. See 1 Handling Drunk Driving Cases § 11:2.

In turn, Dr. Goodman's probable expert witness testimony would have educated the jury on the medical effects of Brown's alcohol consumption on his consciousness which would have significantly bolstered Brown's voluntary intoxication defense. For this same reason, the exclusion of Dr. Goodman's proposed expert witness testimony prohibited Brown from providing the jury with a medical opinion concerning the acuteness of his intoxication. As a result, the trial court's denial of Brown's *Daubert* hearing and jury trial motion for continuance had fatally prejudicial consequences.

*Erroneous Denial of Motion for Continuance Harmed Brown*

In summary, none of the *Howard* factors weighed against granting Brown's *Daubert* hearing and jury trial motion for continuance. Under the fact-findings made by the trial court, the *Howard* factor regarding diligence neither weighed in favor nor against the granting or denial of Brown's motion. Although Brown's case had been pending 16 months and Brown had previously received 5 continuances when he requested the continuance at issue, Falk had taken affirmative steps to secure Dr. Goodman's attendance at Brown's jury trial. Meanwhile, the remaining *Howard* factors—the probability of the witness' ability to appear later, the prejudice to the defendant by denying the continuance, and the materiality and importance of the witness' probable testimony—weighed strongly in Brown's favor. Brown's sole legally valid defense was voluntary intoxication, and Dr. Goodman's report bolstered Brown's voluntary intoxication defense.

Although it is readily apparent the trial court erred by denying Brown's motion for continuance, the State contends that this court should affirm because overwhelming evidence supported Brown's convictions, rendering the trial court's error harmless. Yet, as

84

explained at length already, overwhelming evidence did not support Brown's guilt. And the trial court's denial of Brown's motion for continuance seriously prejudiced Brown's ability to present his sole legally valid defense—voluntary intoxication. Because the trial court abused its discretion by denying Brown's motion for continuance, we reverse Brown's aggravated burglary and aggravated sexual battery convictions and remand for a new trial.

*Does the Admission of Brown's Butler County Battery at Trial Require Reversal of His Convictions?*

In his final argument concerning trial errors, Brown challenges the trial court's admission of his Butler County simple battery conviction into evidence under K.S.A. 2017 Supp. 60-455(d) in several ways. Because we have reversed Brown's aggravated burglary and aggravated sexual battery convictions, however, consideration of Brown's argument that the trial court improperly admitted evidence of his Butler County simple battery conviction under K.S.A. 2017 Supp. 60-455(d) is unnecessary.

Even so, we want to briefly address Brown's legal argument regarding the plain language of K.S.A. 2017 Supp. 60-455(d) and a potential due process violation to assist the trial court on remand. Statutory interpretation presents a question of law over which we exercise de novo review. *State v. LaPointe*, 309 Kan. 299, 312, 434 P.3d 850 (2019). The most fundamental rule of statutory construction is that the intent of the Legislature governs. To determine the intent of the Legislature, we must first look to the plain language of the disputed statute. 309 Kan. at 314.

K.S.A. 2017 Supp. 60-455(d) states:

"Except as provided in K.S.A. 60-445, and amendments thereto, in a criminal action in which the defendant is accused of a sex offense under . . . articles 54, 55 or 56

85

of chapter 21 of the Kansas Statutes Annotated, or K.S.A. 21-6104, 21-6325, 21-6326 or 21-6419 through 21-6422, and amendments thereto, *evidence of the defendant's commission of another act or offense of sexual misconduct is admissible*, and may be considered for its bearing on any matter to which it is relevant and probative." (Emphasis added.)

K.S.A. 2017 Supp. 60-455(g)(1) goes on to define "an 'act or offense of sexual misconduct'" as "[a]ny conduct proscribed by . . . article 55 of chapter 21 of the Kansas Statutes Annotated, or K.S.A. 21-6419 through 21-6422, and amendments thereto."

Thus, the plain language of K.S.A. 2017 Supp. 60-455(d) provides that there needs to be only "evidence of the defendant's *commission* of another act or offense of sexual misconduct." (Emphasis added.) In turn, under the plain language of K.S.A. 2017 Supp. 60-455(d), the State may admit evidence of a defendant's prior sexual misconduct even if that defendant was never charged and convicted for that sexual misconduct. In this case, the State alleged that although Brown pleaded guilty to simple battery in his Butler County case, the facts of his Butler County case established that he had committed the elements of a sexual battery. A sexual battery falls under "[article 55] of chapter 21 of the Kansas Statutes Annotated" as stated in K.S.A. 2017 Supp. 60-455(d). See K.S.A. 2017 Supp. 21-5505(a). So regardless of what Brown pleaded to, so long as evidence supported that Brown committed the elements of a sexual battery in Butler County when he grabbed S.W.'s breast, the plain language of K.S.A. 2017 Supp. 60-455(d) does not prohibit the admission of this evidence.

As for Brown's due process argument, our Supreme Court precedent does not support Brown's argument. In *State v. Boysaw*, 309 Kan. 526, 439 P.3d 909 (2019), our Supreme Court considered Boysaw's constitutional challenge to the admission of his prior sexual misconduct into evidence at his jury trial. Ultimately, our Supreme Court held that the admission of Boysaw's previous sexual misconduct at trial under K.S.A. 2018 Supp. 60-455(d) did not violate his due process rights, providing the following explanation:

"The history of the use of propensity evidence in Kansas, coupled with the procedural safeguard of weighing the probative against the prejudicial effect of the evidence, leads us to conclude that K.S.A. 2018 Supp. 60-455(d) does not offend any principle of justice so rooted in the traditions and conscience of the people of this state that it may be deemed fundamental. K.S.A. 2018 Supp. 60-455(d) does not violate federal constitutional protections." 309 Kan. at 536.

Kansas trial courts and appellate courts are duty bound to follow our Supreme Court precedent unless there is some indication that our Supreme Court is moving away from that precedent. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). Here, there is no indication that our Supreme Court is moving away from its holding in *Boysaw* that the admission of a defendant's prior sexual misconduct at trial under K.S.A. 2018 Supp. 60-455(d) does not violate that defendant's due process rights.

Thus, for the preceding reasons, Brown's legal arguments concerning the trial court's admission of his Butler County simple battery conviction under K.S.A. 2017 Supp. 60-455(d) are meritless. As a result, upon remand, the State may again move to admit evidence of Brown's Butler County simple battery conviction under K.S.A. 2017 Supp. 60-455(d). If the State does try to admit this evidence, the trial court will need to determine whether the prejudicial effect of the admission of this evidence outweighs its probative value of the admission of this evidence. See *Boysaw*, 309 Kan. at 539 (explaining the test to apply when determining whether to admit evidence of a defendant's prior sexual misconduct under K.S.A. 2018 Supp. 60-455[d]). Nevertheless, we caution that our holding should not be taken as support for the prosecutor's misleading arguments implying that Brown could raise a voluntary intoxication defense in that case. Indeed, the fact that the prosecutor was able to make this misleading argument is indicative of the possible prejudicial consequences of admitting Brown's Butler County simple battery conviction into evidence.

Brown's convictions are reversed and the case is remanded for a new trial, excluding Brown's incriminating pre-*Miranda* statements to Sergeant Becker from the evidence.

\* \* \*

MCANANY, S.J., concurring in part and dissenting in part: I agree with the majority opinion on all issues but one. I write separately to join in that part of Judge Malone's dissent below regarding the district court's refusal to grant yet another continuance on the morning of trial. I am satisfied that the court considered and weighed the factors in *State v. Howard*, 221 Kan. 51, 55, 557 P.2d 1280 (1976), though the court did not put a "*Howard*" label on its analysis.

Considering those factors: (1) The witness' availability at a later date favors a continuance, though this is tempered by factor (4); (2) trial counsel's efforts to assure the expert's attendance at trial were somewhat incomplete (or as earlier expressed, "not completely negligent," slip op. at 76), rendering this factor relatively neutral; (3) the prejudice factor is tied to the next factor; and (4) the likely inadmissibility of the expert's testimony strongly favors the denial of a continuance, vitiates any concern of prejudice from the court's ruling, and tends to undermine the fact that the expert would be available at a later trial date. On balance, consideration of these factors favors the court's denial of Brown's continuance motion.

Expanding on *Howard* factor (4), the admissibility of expert testimony under K.S.A. 2017 Supp. 60-456(b) is predicated on three factors: (1) Whether the testimony will be helpful to the jury; (2) the expert qualifications of the witness, and (3) the scientific reliability of the data. The threshold issue is whether the testimony would be helpful. If it is not, it does not matter how qualified the witness is or the scientific basis for the testimony. Here, the court found the testimony would not be particularly helpful

88

because, as Judge Malone notes below, Brown's defense was voluntary intoxication—not a rarity in the trial of cases such as this—not involuntary intoxication, and there were several witnesses who testified to Brown's voluntary intoxication at the time of these events. Expert testimony would not be helpful to the jury in considering this defense. Thus, *Howard* factors (3) and (4) and to a significant extent factor (1) support a denial of the continuation motion. I find no abuse of discretion in denying Brown's motion to continue the trial.

* * *

MALONE, J., concurring in part and dissenting in part: I agree with the majority's decision that the district court did not err in admitting evidence of Jeremiah Wilton Brown's Butler County simple battery conviction under K.S.A. 2017 Supp. 60-455(d). But I respectfully disagree with the majority opinion on all other issues, and I would uphold Brown's convictions of aggravated burglary and aggravated sexual battery.

*Prosecutorial error in closing argument*

There were several instances of prosecutorial error in the closing argument, but I would find that none of the errors should result in the reversal of Brown's convictions. First, the prosecutor telling the jury "you don't have to consider" the lesser offense of sexual battery has some basis in the law. Instruction number 7 told the jury that it only needed to consider the charge of sexual battery "[i]f you do not agree that the defendant is guilty of aggravated sexual battery." The prosecutor was simply telling the jury that it need not reach the lesser offense of sexual battery unless it had a reasonable doubt on the charge of aggravated sexual battery. If there was any error in the prosecutor's statement, I would find it harmless because, quite frankly, I think the lesser offense instruction on sexual battery was factually inappropriate and should not have been given. The evidence was undisputed that M.K. was "overcome by force or fear," which is the difference between aggravated sexual battery and sexual battery. See K.S.A. 2020 Supp. 21-5505.

89

Next, the prosecutor stating in closing argument that the judge had the "hard job" was simply a clumsy way to tell the jury that its only concern is determining whether the defendant is guilty or not guilty and the disposition of the case is not for the jury to consider. The prosecutor should have stayed away from the subject, but she went on to say that the judge will "have all [the] information when it's time to decide what happens next." Any error in the prosecutor making this statement was harmless.

I agree with the majority that the prosecutor's reference to Brown's voluntary intoxication defense as "a big fat excuse" was error. But I disagree with the majority's conclusion that the trial court compounded this error by stating when ruling on an objection that voluntary intoxication was not a defense in Brown's case. During redirect examination, Detective Brady Simmons testified to the effect that it did not make any difference to him that Brown was drunk when he committed the crimes. On recross-examination, defense counsel followed up on Simmons' statement and began to ask "but that's not what the law says—". The prosecutor objected and the trial court stated:

> "Okay. The question that [the prosecutor] asked was does that have anything to do with whether you're going to investigate a crime. And he said no. That's what he said, *he didn't say anything about the law says that intoxication isn't a defense and it's not a defense in this case."* (Emphasis added.)

The majority concludes that the trial court's remark was a "misstatement of the law" and that Brown was highly prejudiced by the fact that the trial court told the jury that voluntary intoxication was not a defense in the case. Slip op. at 33, 36. I do not read the trial court's statement that way at all. The statement read in isolation is confusing and includes either a double or a triple negative. But when the statement is read in its proper context, I believe the trial court was simply expressing its belief that defense counsel had mischaracterized Simmons' prior testimony and that Simmons had never testified that voluntary intoxication was not a legal defense in Brown's case.

90

To me, the biggest error was the prosecutor telling the jury that "you don't have to consider" the voluntary intoxication defense and that "[y]ou can skip it if you want." But although these statements were erroneous, I do not think they changed the result of the trial. Brown's case is very similar to *State v. McCorkendale*, 267 Kan. 263, 979 P.2d 1239 (1999), where the defendant raised a voluntary intoxication defense to the charge of premeditated first-degree murder. In closing argument, the prosecutor told the jury it could "'totally disregard'" the instruction on voluntary intoxication. 267 Kan. at 282. The prosecutor also told the jury that it did not need to consider the instructions on the lesser offenses of manslaughter and that those instructions were "'thrown in to confuse you.'" 267 Kan. at 282. Our Supreme Court expressed "no hesitancy" in finding that the statement was improper. 267 Kan. at 282. But our Supreme Court observed that the district court properly instructed the jury on voluntary intoxication and that there was no basis in the record to find that the jury did not follow the instructions. 267 Kan. at 284. Based on the entire record, the court found "beyond a reasonable doubt that such remarks had little, if any, likelihood of changing the result of the trial." 267 Kan. at 284.

Here, the prosecutor used most unfortunate language by telling the jury it did not need to consider the instruction on voluntary intoxication. But we can presume that the jurors were 12 reasonable and intelligent persons who knew that the whole point of the 5-day trial was for the jury to decide whether Brown was guilty of the charged crimes or not guilty based on his sole defense of voluntary intoxication. The district court properly instructed the jury on Brown's voluntary intoxication defense, and the court instructed the jury that it "must decide the case by applying these instructions to the facts as you find them." The district court also instructed the jury that it must "consider everything admitted into evidence." Finally, the district court instructed the jury that its verdict "must be founded entirely upon the evidence admitted and the law as given in these instructions." Appellate courts presume that juries follow the district court's instructions. *State v. Corey*, 304 Kan. 721, 734, 374 P.3d 654 (2016).

Our Supreme Court has stated that even if the prosecutor's actions are egregious, reversal of a criminal conviction is not an appropriate sanction if the error falls within the constitutional harmless error test. *State v. Sherman*, 305 Kan. 88, 104-07, 114, 378 P.3d 1060 (2016). Brown had a fair chance to present his voluntary intoxication defense, but the jury rejected it. After reading the transcript of Brown's jury trial, I would find beyond a reasonable doubt that the prosecutor's improper comments in closing argument—even if categorized as egregious—did not affect the outcome of the trial in light of the entire record. Thus, reversal of Brown's convictions is not the appropriate sanction for the error. See *Sherman*, 305 Kan. at 104-07.

*Brown's pre-Miranda statements*

This issue involves a brief conversation between Sergeant Amos Becker and Brown when officers went to Brown's house to arrest him for his crimes. As another officer conducted a pat-down, Becker and Brown had the following conversation:

> Sergeant Becker:  "I'm assuming you were kind of expecting us."
> Brown:  "Uh, no."
> Sergeant Becker:  "No."
> Brown:  "She didn't say anything."
> Sergeant Becker:  "Okay."
> Brown:  "She didn't say she was going to call the cops on me."
> Sergeant Becker:  "Okay."
> Brown:  "I told her I was sorry."
> Sergeant Becker:  "Okay. I'll tell you what, we will go ahead and get in that discussion with our detective. We're not going to be talking to me about it. We'll just . . ."
> Brown:  "I didn't really do anything, you know. I didn't take my clothes off or anything."
> Sergeant Becker:  "Okay."

I think it is a close call on whether the statements made at the pat-down were the result of an interrogation, i.e., express questioning or its functional equivalent reasonably likely to elicit an incriminating statement. See *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). But even if the district court erred by allowing the evidence, I would find it harmless beyond a reasonable doubt.

The jury heard substantial testimony from Jeremy Convery, Jason Conner, and Luke Rogge establishing how much Brown had to drink on the day and evening of the crimes. Brown's actions and his thought process must have been impaired to some degree by his level of intoxication. The jury was allowed to compare the testimony from Brown's friends with M.K.'s detailed account of Brown's actions at her house that night, including Brown's repeated statements to M.K. that he wanted to have sex with her and M.K.'s testimony that she could feel that Brown had an erection. Brown laid on top of M.K. for 30 minutes while repeatedly telling her that "he wanted to have sex with [her]" and "lick [her] pussy." Even after M.K. succeeded in getting Brown to leave, he came back about an hour later and wanted back inside the house. It is reasonable to conclude that the jury based its decision about whether Brown was too intoxicated to form the necessary intent to commit the crimes based on the evidence of Brown's conduct on the night of the crimes, and I find it unlikely that Brown's few brief statements to Becker when he was arrested made any difference in the jury's decision.

Brown's conduct on the night of the crimes is undisputed. Brown's sole defense was that he was too intoxicated to form the necessary intent to commit the crimes, not that he did not engage in those acts. I simply do not find Brown's statements to Becker to be very incriminating given his defense. Any error in the admission of the evidence did not affect the outcome of the trial based on the entire record.

93

*Motion for trial continuance*

In January 2018, after many prior trial continuances, the district court set Brown's jury trial date for April 9, 2018, noting that the new jury trial date was "very firm." Brown's attorney, Roger Falk, intended to call Dr. Mark Goodman, a licensed psychologist and pharmacologist, as an expert witness. Despite having Goodman's expert report in mid-February 2018, Falk did not provide the State a copy of the report until the week before the scheduled jury trial. Upon receiving the report, the State moved the district court to hold a hearing on Goodman's qualifications to testify as an expert witness under K.S.A. 2017 Supp. 60-457(b) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The district court scheduled the hearing to occur on the morning of the first day of the jury trial. When Falk notified Goodman of the hearing time, Goodman explained to Falk that he could not attend the hearing because he had scheduled other appointments that week and because Falk had never "let him . . . know [the] date and time he would have to [testify]." Falk asked for a trial continuance to secure Goodman's testimony, but the district court denied the request.

Under these facts, the district court did not abuse its discretion in denying Falk's last-minute motion for a trial continuance. Goodman's expert report reveals that he intended to testify primarily in support of an *involuntary* intoxication defense based on Brown's chronic alcoholism and his addiction to marijuana at the time of his offense. But our Supreme Court has held that involuntary intoxication must involve some sort of compulsion, trickery, or deception. *State v. Palacio*, 221 Kan. 394, Syl. ¶ 1, 559 P.2d 804 (1977). Those facts are not present in Brown's case, so involuntary intoxication would not have been a valid defense to the charges against him.

The district court's decision to deny a continuance for Brown to secure Goodman's testimony did not prevent Brown from proceeding with his voluntary intoxication defense, which does not require expert testimony to support. Brown called several

witnesses to support his voluntary intoxication defense. There is no question that he had been drinking excessively and was very drunk on the evening in question. But based on M.K.'s testimony, the jury found that Brown could form the necessary intent to commit the crimes. The district court did not err in denying the motion for a trial continuance.